NO. 13-55373

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

IN RE EASYSAVER REWARDS LITIGATION

Josue Romero; Deanna Hunt; Kimberly Kenyon; Gina Bailey;
Alissa Herbst; Grant Jenkins; Bradley Berenston; Jennifer Lawler;
Daniel Cox; Jonathan Walter; and Christopher Dickey,
*Plaintiffs-Appellees*,

Brian Perryman,
*Objector-Appellant*,

v.

Provide Commerce, Inc.; Encore Marketing International, Inc.; and
Regent Group, Inc.,
*Defendant-Appellees*.

On Appeal from the United States District Court
for the Southern District of California, No. 3:09-cv-2094 AJB

Opening Brief of Appellant Brian Perryman

CENTER FOR CLASS ACTION FAIRNESS
Theodore H. Frank
Adam Ezra Schulman
1718 M Street NW, No. 236
Washington, D.C. 20036
(703) 203-3848
*Attorneys for Objector-Appellant Brian Perryman*

# Table of Contents

Table of Contents.................................................................................. i

Table of Authorities .......................................................................... iii

Statement of Subject Matter and Appellate Jurisdiction.................. 1

Statement of the Issues ....................................................................... 2

Statutes and Rules................................................................................ 5

Statement of the Case ......................................................................... 7

Statement of the Facts ........................................................................ 8

      A.      EasySaver Rewards and the class complaint. .......................... 8

      B.      The settlement and fee request. ............................................. 10

      C.      Brian Perryman objects........................................................... 12

      D.      The district court refuses to apply the Class Action Fairness Act and approves the settlement and $8.85 million attorney award. ..................... 14

Summary of Argument ...................................................................... 17

Preliminary Statement ....................................................................... 17

Argument............................................................................................ 19

I.     The district court's failure to correctly value the coupons in this settlement led to reversible error in its approval of the settlement and attorney award. .......... 19

      A.      A district court must protect absent class members' interests................ 20

      B.      The Class Action Fairness Act does not make an exception for settlements with a recovery of coupons to a class member just because cash is also available in the settlement. ....................................................... 21

          1.   The "credits" are coupons. ................................................... 21

          2.   Settlements that provide the recovery of coupons, whether or not other relief is offered, are governed by the Class Action Fairness Act. ........................................................ 25

      C.      CAFA requires that coupons be valued at "the value to class members of the coupons that are redeemed." The district court thus erred as a matter of law by valuing this settlement's coupons at face value. ...................... 27

    D.    Even if CAFA did not apply, the district court's valuation of the coupon at face value is clearly erroneous.................................................. 29

II.    The settlement's *cy pres* provisions unfairly favored local institutions and entities affiliated with class counsel over the class. .......................................... 35

    A.    *Cy pres* beneficiaries should not have a pre-existing relationship with class counsel. ...................................................................... 37

    B.    "Next best" *cy pres* for a nationwide class should have nationwide scope. ........................................................................... 40

    C.    This Court should endorse the Fifth Circuit and ALI holding that *cy pres* is a "last resort" inappropriate when there are undercompensated class members. ..................................................................... 42

III.    Objector Perryman has standing to appeal the settlement approval and to appeal the fee award. ......................................................... 49

Conclusion.................................................................... 52

Statement of Related Cases  pursuant to Circuit Rule 28-2.6 ........................ 54

Certificate of Compliance  with Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1 ........ 55

Proof of Service ............................................................... 56

# Table of Authorities

<u>Cases</u>

*In re Airline Ticket Commission Antitrust Litig.*,
    268 F.3d 619 (8th Cir. 2001) ............................................................40-41

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ........................................................................ 21

*In re Baby Products Antitrust Litig.*,
    708 F.3d 163 (3d Cir. 2013) ........................................4, 35, 43-46, 48, 53

*Beecher v. Able*,
    575 F.2d 1010 (2d Cir. 1978) ............................................................ 47

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................ 49

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ............................2, 4-5, 18, 21, 34, 47, 50, 52

*Brotherhood of R.R. Trainmen v. Baltimore & O.R. Co.*,
    331 U.S. 519 (1947) ........................................................................ 25

*Broussard v. Meineke Disc. Muffler Shops*,
    155 F.3d 331 (4th Cir. 1998) ............................................................ 45

*Casey v. Albertson's Inc.*,
    362 F.3d 1254 (9th Cir. 2004) ....................................................... 2, 4-5

*Churchill Vill., LLC v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ............................................................ 20

*In re Classmates.com Consol. Litig.*,
    2012 U.S. Dist. LEXIS 83480 (W.D. Wash. Jun. 15, 2012) ................................ 18

*CLRB Hanson Indus., LLC v. Weiss & Assocs., PC*,
    465 Fed. Appx. 617 (9th Cir. 2012) ....................................................26-27

*Cobell v. Salazar*,
  679 F.3d 909 (D.C. Cir. 2012) ................................................................ 50

*Dennis v. Kellogg Co.*,
  697 F.3d 858 (9th Cir. 2012) ...................................................21, 35, 50

*Devlin v. Scardelletti*,
  536 U.S. 1 (2002) .........................................................................2, 49-50

*Dunleavy v. Nadler*,
  213 F.3d 454 (9th Cir. 2000) ................................................................ 21

*Fleury v. Richemont N. Am.*, No. C-05-4545-EMC,
  2008 U.S. Dist. LEXIS 112459 (N.D. Cal. Aug. 6, 2008) ..............................22-23

*Galloway v. Kan. City Landsmen, LLC*, No. 4:11-1020-cv-W-DGK,
  2012 U.S. Dist. LEXIS 147148 (W.D. Mo. Oct. 12, 2012) ............................ 22, 30

*Glasser v. Volkswagen of Am.*,
  645 F.3d 1084 (9th Cir. 2011) ...........................................................51-52

*Grant v. Bethlehem Steel Corp.*,
  823 F.2d 20 (2d Cir. 1987) .................................................................. 21

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ............................................................... 21

*In re Heartland Payment Sys., Inc.*,  MDL No. 09-2046,
  2012 U.S. Dist. LEXIS 37326 (S.D. Tex. Mar. 20, 2012) ................................... 46

*In re HP Inkjet Printer Litig.*, No. 11-16097,
  -- F.3d --,  2013 WL 1986396,
  2013 U.S. App. LEXIS 9744 (9th Cir. May 15, 2013)
  ................................................................ 3, 17, 18, 20-32, 45, 47, 52

*Houck v. Folding Carton Admin. Comm.*,
  881 F.2d 494 (7th Cir. 1989) .............................................................40-41

*Khatib v. County of Orange*,
  639 F.3d 898 (9th Cir. 2011) ................................................................ 22

*Klier v. Elf Atochem N. Am., Inc.*,
  658 F.3d 468 (5th Cir. 2011) .............................................................4, 43, 47-48

*Knisley v. Network Assocs.*,
    312 F.3d 1123 (9th Cir. 2002) .................................................................. 51

*Lane v. Facebook*,
    696 F.3d 811 (9th Cir. 2012) .................................................................. 39

*Lane v. Facebook, Inc.*,
    709 F.3d 791 (9th Cir. 2013) ............................................................. 35, 39

*Lobatz v. U.S. West Cellular of Cal., Inc.*,
    222 F.3d 1142 (9th Cir. 2000) .......................................................... 49, 51

*In re Lupron Mkt'g and Sales Practices Litig.*,
    677 F.3d 21 (1st Cir. 2012) ..................................................................... 43

*Mandujano v. Basix Vegetable Prods., Inc.*,
    541 F.2d 832 (9th Cir. 1976) ............................................................. 45-46

*Masters v. Wilhemina Model Agency, Inc.*,
    473 F.3d 423 (2d Cir. 2007) .................................................................. 43

*Mathews v. Chevron Corp.*,
    362 F. 3d 1172 (9th Cir. 2004) ................................................................ 4

*McNeill v. United States*,
    131 S. Ct. 2218 (2011) ........................................................................... 29

*In re Mexico Money Transfer Litig.*,
    267 F.3d 743 (7th Cir. 2001) .................................................................. 29

*Mirfasihi v. Fleet Mortg. Corp.*,
    356 F.3d 781 (7th Cir. 2004) ................................................. 21, 35-36, 44

*Molski v. Gleich*,
    317 F.3d 937 (9th Cir. 2003) .......................................................... 20-21, 35

*Moody v. Sears Roebuck & Co.*,
    664 S.E.2d 569 (N.C. App. 2008) ........................................................... 33

*Nachshin v. AOL*,
    663 F.3d 1034 (9th Cir. 2011) ................................. 3, 17, 18, 35, 37-43, 50

*Northstar Financial Advisors, Inc. v. Schwab Investments,*
    615 F.3d 1106 (9th Cir. 2010) ................................................................ 25

*In re Pet Food Prods. Liab. Litig.,*
    629 F.3d 333 (3d Cir. 2010) .................................................................... 48

*Radcliffe v. Experian Info. Solutions,*
    -- F.3d --, 2013 U.S. App. LEXIS 9126 (9th Cir. May 2, 2013) .......................... 37

*Reynolds v. Beneficial Nat'l Bank,*
    288 F.3d 277 (7th Cir. 2002) .................................................................. 31

*Riordan v. State Farm Mut. Auto. Ins.,*
    589 F.3d 999 (9th Cir. 2009) ................................................................ 3-4

*Rutter & Wilbanks Corp. v. Shell Oil Co.,*
    314 F.3d 1180 (10th Cir. 2002) ............................................................... 50

*Schindler Elevator Corp. v. United States ex rel. Kirk,*
    131 S. Ct. 1885 (2011) ......................................................................... 21

*Shames v. Hertz,* No. 07-CV-2174,
    2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ......................................... 26-27

*Sobel v. Hertz Corp.,* No. 3:06-cv-00545-LRH,
    2011 U.S. Dist. LEXIS 68984 (D. Nev. Jun. 27, 2011) ............................ 33-34

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) .................................................................. 21

*Synfuel v. DHL Express (USA),*
    463 F.3d 646 (7th Cir. 2006) ........................................... 22-23, 26-27, 29

*In re Thornburg Mortg., Inc. Secs. Litig.,*
    885 F. Supp. 2d 1097 (D.N.M. 2012) ...................................................... 48

*True v. American Honda Motor Co.,*
    749 F. Supp. 2d. 1052 (C.D. Cal. 2010) .................................................. 33

*Union Asset Mgmt. v. Dell, Inc.,*
    669 F.3d 632 (5th Cir. 2012) .................................................................. 50

*Union Fidelity Life Ins. Co. v. McCurdy*,
   781 So.2d 186 (Ala. 2000) .................................................................. 33

*United States v. Alabama*
   271 Fed. App'x 896 (11th Cir. 2008) .................................................. 50

*United States v. Havelock*,
   664 F.3d 1284 (9th Cir. 2012) (*en banc*) ...........................................2

*In re Wells Fargo Sec. Litig.*,
   991 F. Supp. 1193 (N.D. Cal. 1998).................................................. 38

*Zimmerman v. Oregon Dep't. of Justice*,
   170 F.3d 1169 (9th Cir. 1999) ........................................................... 23

Rules and Statutes

15 U.S.C. §1693 ..............................................................................................1

28 U.S.C. §1291..............................................................................................2

28 U.S.C. §1331..............................................................................................1

28 U.S.C. §1332(d)(2) ....................................................................................1

28 U.S.C. §1332(d)(2)(A) ...............................................................................1

28 U.S.C. §1711.......................................................................................... 21

28 U.S.C. §1711, note §2(a)(3)(A) ........................................................ 5, 33

28 U.S.C. §1712........................................................2-3, 5-6, 17, 22-29, 35

28 U.S.C. §1712(a) ................................................................5, 19-20, 25-28

28 U.S.C. §1712(b) ...............................................................................5-6, 25

28 U.S.C. §1712(c) ................................................................................. 6, 25

28 U.S.C. §1712(e) ...................................................................6, 25, 28-29, 34

28 U.S.C. §1714............................................................................................ 41

28 U.S.C. §2072 .......................................................................................... 48

Cal. Const. Art. IX, §9 ............................................................................... 41

Fed. R. App. Proc. 4(a)(1)(A) ......................................................................1

Fed. R. Civ. Proc. 11 ................................................................................. 14

Fed. R. Civ. Proc. 23 ...................................................................................1

Fed. R. Civ. Proc. 23(e) ...............................................................................7

Fed. R. Civ. Proc. 23(e)(2) ...........................................................................7

Fed. R. Civ. Proc. 23(h) ............................................................................ 11

Fed. R. Civ. Proc. 58 ...................................................................................1

Restore Online Shoppers' Confidence Act,
    Pub. L. No. 111-345, 124 Stat. 3618 (2010) ..........................................8

U.S. Const., Art. III ..............................................................................49-50


Other Authorities

American Heritage Dictionary of the English Language (5th ed. 2011) .................21-22

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. §3.07 (2010) ..................... 43, 48

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. §3.07(b) (2010) ................42-43

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. §3.07 *comment b* (2010)
    ...........................................................................................36, 38, 43

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. §3.13 *comment a* (2010) .......... 46

Brunet, Edward,
 *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors,*
 2003 U Chi. Legal F. 403.............................................................................. 19

Dickerson, Thomas A.,
 *Class Actions: The Law of 50 States §9.03[1] (2005)* ...........................................27-28

*Examination of Litigation Abuse: Hearing Before the Subcommittee on the Constitution*
 *and Civil Justice of the House Comm. On the Judiciary,*
 113th Cong. (Mar. 13, 2013) ...................................................................... 42

Federal Judicial Center,
 *Managing Class Action Litig.: A Pocket Guide for Judges* (3d ed. 2010) .................... 31

Feeley, Jeff & Myron Levin,
 *Ford Accord Garners Less Than 1 Percent Participation,*
 Bloomberg (July 7, 2009).............................................................................. 33

Hantler, Steven B. & Robert E. Norton*,*
 *Coupon Settlements: The Emperor's Clothes of Class Actions,*
 18 Geo. J. Legal Ethics 1343 (2005) ................................................................ 33

Jones, Ashby,
 *A Litigator Fights Class-Action Suits,*
 Wall St. J. (Oct. 31, 2011).............................................................................. 18

Karlsgodt, Paul & Raj Chohan,
 *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval,*
 BNA: Class Action Litig. Report (Aug. 12, 2011)................................................ 19

Krueger, George & Judd Serotta,
 Op-Ed, *Our Class-Action System is Unconstitutional,*
 Wall St. J. (Aug. 6, 2008) .............................................................................. 38

Lahav, Alexandra D.,
 *Two Views of the Class Action,*
 79 Fordham L. Rev. 1939 (2011) .................................................................... 38

Leslie, Christopher R.,
 *A Market-Based Approach to Coupon Settlements in Antitrust and Consumer*
 *Class Action Litigation,* 49 UCLA L. Rev. 991 (2002) ...........................24-26, 30-31

Liptak, Adam,
    *Doling out Other People's Money*, N.Y. TIMES, Nov. 26, 2007 .................................. 38

Redish, Martin H. et al.,
    *Cy Pres Relief & the Pathologies of the Modern Class Action:*
    *A Normative and Empirical Analysis,*
    62 FLA. L. REV. 617 (2010).................................................................. 38, 42, 46, 48

S. Rep. No. 109-14 (2005) ...................................................................................... 23, 30

Tharin, James, *FTC Workshop—Protecting Consumer Interests in Class Actions,*
    *September 13-14, 2004: Workshop Transcript: Panel 3: Clear Notices, Claims*
    *Administration, and Market Makers, in*
    18 Geo. J. Legal Ethics 1223 (2005) ...................................................... 32

Tharin, James & Brian Blockovich,
    *Coupons and the Class Action Fairness Act,*
    18 Geo. J. Legal Ethics 1443 (2005) ...................................................... 33

Yospe, Sam,
    Cy Pres *Distributions in Class Action Settlements,*
    2009 Columbia Bus. L. Rev. 1014......................................................... 42

Zabcik, Brian,
    *Conscientious Objector*, LITIGATION 11 (Spring 2013),
    *available at* http://is.gd/alm_frank2013 (redirect) ................................................. 18

## Statement of Subject Matter and Appellate Jurisdiction

The district court had federal question jurisdiction under 28 U.S.C. §1331, because the plaintiffs' complaint alleges violations, *inter alia*, of the Electronic Funds Transfer Act, 15 U.S.C. §1693 *et seq.* The district court also had diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2)(A), because the case is a class action filed under Fed. R. Civ. Proc. 23; at least one member of the national class is a citizen of a state different from one defendant; the number of members of all proposed plaintiff classes in the aggregate is at least 100; the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs; and no exception to 28 U.S.C. §1332(d)(2) applies. For example, class member and objector Brian Perryman is a citizen of Virginia, while defendant Provide-Commerce is a Delaware corporation with its principal place of business in California; defendant Encore Marketing International is a Delaware corporation with its principal place of business in Maryland; and Regent Group is a California corporation with its principal place of business in Maryland.

The court's final judgment, pursuant to Fed. R. Civ. Proc. 58, issued on February 21, 2013. ER3.[1] Perryman filed a notice of appeal on March 4, 2013. ER38. This notice is timely under Fed. R. App. Proc. 4(a)(1)(A).

On May 6, 2013, the district court issued an order requiring Perryman to post a $15,000 appeal bond or dismiss his appeal. ER1. Perryman posted the bond (Dkt.

---

[1] "ER" refers to Perryman's Excerpts of Record. "Dkt." refers to the district-court docket in this case.

1

292) and timely amended his notice of appeal on June 5, 2013, to include an appeal of this collateral order. ER31.

This court has appellate jurisdiction because this is a timely-filed appeal from a final judgment under 28 U.S.C. §1291. Perryman, as a class-member and objector to settlement approval, has standing to appeal a final approval of a class action settlement without the need to intervene formally in the case. *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

## Statement of the Issues

1.     The Class Action Fairness Act ("CAFA") expressly contemplates and sets forth rules for coupon settlements that include relief other than coupons. 28 U.S.C. §1712. Did the district court err as a matter of law in holding that CAFA did not apply to a coupon settlement because it also paid class members a total of about $225,000 in cash? (Raised at ER120-24, ER69-72; ruled on at ER14-17, ER30.)

**Standard of Review:** "[M]atters of statutory interpretation" are questions of law reviewed *de novo. E.g., United States v. Havelock,* 664 F.3d 1284, 1289 (9th Cir. 2012) (*en banc*). A district court decision to approve a class action settlement is reviewed for abuse of discretion. *In re Bluetooth Headset Prod. Liab. Lit.*, 654 F.3d 935, 940 (9th Cir. 2011). A failure to apply the correct standard of law is an abuse of discretion. *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004).

2(a).  28 U.S.C. §1712 requires that a court calculating an attorney fee for a "proposed settlement in a class action [that] provides for a recovery of coupons to a

class member" to value the coupons "based on the value to class members of the coupons that are redeemed." *Accord In re HP Inkjet Printer Litig.*, No. 11-16097, -- F.3d --, 2013 WL 1986396 (9th Cir. May 15, 2013). Did the district court commit an error of law in determining attorneys' fees without determining the "value to class members of the coupons that are redeemed" and ascribing a $20 value to a coupon that was not stackable with already existing discounts? (Raised at ER120-24, 141-46, 70-72; ruled on at ER14-17, 23-24, 27-30.)

**Standard of Review:** Questions of law are reviewed *de novo. Riordan v. State Farm Mut. Auto. Ins.*, 589 F.3d 999, 1004 (9th Cir. 2009).

2(b). In the alternative, if the Class Action Fairness Act does not apply, did the district court commit clear error in finding that the value of the settlement was $38 million and awarding $8.85 million in attorney awards, when the class would receive only about $225,000 in cash plus coupons that were unlikely to be redeemed and even less likely to be redeemed in such a manner to provide the full face value to class members? (Raised at ER120-24, 141-46, 72; ruled on at ER23-24, 27-30.)

3. *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011), held that it was error for *cy pres* to favor local charities when there was a national class, and criticized the possibility of conflicts of interest between class counsel and *cy pres* recipients. Did the district court commit an error of law or abuse its discretion in approving a *cy pres* component of a settlement involving a national class that favored the alma mater of class counsel, and only distributed funds to local San Diego-area institutions? (Raised at ER124-29, 72-76; ruled on at ER18-22, 28-30.)

**Standard of Review:** Questions of law are reviewed *de novo*. *Riordan*, 589 F.3d at 1004. A district court decision to approve a class action settlement is reviewed for abuse of discretion. *Bluetooth*, 654 F.3d at 940. A failure to apply the correct standard of law is an abuse of discretion. *Casey*, 362 F.3d at 1257.

4(a).   Under *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468 (5th Cir. 2011), a settlement fund "belongs solely to the class members." Did the district court err as a matter of law in approving a settlement that provided over $3 million for *cy pres* but only about $225,000 for class members when there were class members who had not been fully compensated and 99.8% of the class had not made claims? (Raised at ER127-29, 75-76; ruled on at ER18-24, 27-30.)

**Standard of Review:** Questions of law are reviewed *de novo*. *Riordan*, 589 F.3d at 1004. The district court's ruling that additional distributions to the class above $225,000 would be a "windfall" (ER22) is a question of mixed law and fact that is reviewed *de novo*. *Mathews v. Chevron Corp.*, 362 F. 3d 1172, 1180 (9th Cir. 2004).

4(b).   In the alternative, if *Klier* does not apply, *In re Baby Products Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013), requires a district court to consider the ratio of *cy pres* to actual class recovery when evaluating the fairness of a settlement. Did the district court err as a matter of law in rejecting Perryman's request that this factor be considered where *cy pres* recipients would receive more than ten times as much cash as the class would and class counsel would receive more than forty times as much? (Raised at ER127-29, 75-76; ruled on at ER18-24, 27-30.)

**Standard of Review:** Questions of law are reviewed *de novo*. *Riordan*, 589 F.3d at 1004. A district court decision to approve a class action settlement is reviewed for abuse of discretion. *Bluetooth*, 654 F.3d at 940. A failure to apply the correct standard of law is an abuse of discretion. *Casey*, 362 F.3d at 1257.

## Statutes and Rules

### 28 U.S.C. §1711 note.

…

§2(a) Findings. Congress finds the following: …

(3) Class members often receive little or no benefit from class actions, and are sometimes harmed, such as where—

(A) counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value;

(B) unjustified awards are made to certain plaintiffs at the expense of other class members; and

(C) confusing notices are published that prevent class members from being able to fully understand and effectively exercise their rights.

### 28 U.S.C. §1712.

**(a)    Contingent fees in coupon settlements.**– If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

**(b)    Other attorney's fee awards in coupon settlements.**–

**(1)    In general.**– If a proposed settlement in a class action provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel,

any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action.

(2)    **Court approval.**– Any attorney's fee under this subsection shall be subject to approval by the court and shall include an appropriate attorney's fee, if any, for obtaining equitable relief, including an injunction, if applicable. Nothing in this subsection shall be construed to prohibit application of a lodestar with a multiplier method of determining attorney's fees.

**(c)    Attorney's fee awards calculated on a mixed basis in coupon settlements**.– If a proposed settlement in a class action provides for an award of coupons to class members and also provides equitable relief, including injunctive relief–

(1)    that portion of the attorney's fee to be paid to class counsel that is based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (a); and

(2)    that portion of the attorney's fee to be paid to class counsel that is not based upon a portion of the recovery of coupons shall be calculated in accordance with subsection (b).

…

**(e)    Judicial Scrutiny of Coupon Settlements.**– In a proposed settlement under which class members would be awarded coupons, the court may approve the proposed settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members. The court, in its discretion, may also require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties. The distribution and redemption of any proceeds under this subsection shall not be used to calculate attorneys' fees under this section.

**Federal Rule of Civil Procedure 23. Class Actions.**

…

**(e)    Settlement, Voluntary Dismissal, or Compromise.**
The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

…

(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

…

(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

…

## Statement of the Case

Plaintiffs filed a putative class complaint against the three defendants alleging that their practices of enrolling customers in their Rewards Programs are unfair and unlawful under federal and state law. ER201. Before the plaintiffs filed a motion for class certification, the parties proposed a settlement of the putative class action. ER147. Over an objection from appellant and class member Brian Perryman (ER108, 141), and despite a concession from plaintiffs that only about $225,000 of cash would be distributed to class members (ER86), the district court approved the settlement and the request for a $8.85 million attorney award. ER9. Final judgment issued February 21, 2013. ER3. Perryman timely appealed. ER38.

## Statement of the Facts

In May 2009, the U.S. Senate Committee on Commerce, Science, and Transportation investigated the e-commerce marketing practice of a "data pass enrollment process," whereby consumers who use a credit card to purchase goods and services from an Internet retailer find themselves, through "aggressive sales tactics intentionally designed to mislead online shoppers" signed up for a third-party service that bills their credit card monthly. ER216-17. The investigation eventually led to legislation, the Restore Online Shoppers' Confidence Act, Pub. L. No. 111-345, 124 Stat. 3618 (2010), that explicitly barred such practices. ER217. This lawsuit, first filed on September 24, 2009 (Dkt. 1), piggybacked on that months-earlier investigation, and sought to recover for pre-ROSCA acts under existing federal and state law.

## A.    EasySaver Rewards and the class complaint.

Defendant Provide operates several internet businesses, including ProFlowers.com and RedEnvelope.com. Customers order products on these websites, usually for gift delivery, and pay for the purchase with a credit or debit card or PayPal account. ER202.

Provide works with third-party marketing partners Defendants Regent Group, Inc. (doing business under Encore Marketing International) and Encore Marketing International, Inc. (collectively "Encore"), which manage "saving programs" such as EasySaver Rewards (the "Rewards Programs" or "Membership Programs"; for ease of reference, collectively "EasySaver Rewards") on Provide's behalf. ER10.

Plaintiffs allege in a class action complaint that the defendants' practices of enrolling customers in the Rewards Programs violate federal and state law. They contend that Provide transmits its customers' private payment information to Encore, who then uses this information to charge those customers without permission under the guise that the consumers authorized the charges when they supposedly joined the Rewards Programs. ER10.

Specifically, when class members completed a purchase on a Provide retail website, they were presented with a pop-up window offering $15 off their next purchase as a "Thank You" gift, and asking them to enter their zip code and email address and click "Accept" to receive the gift. Plaintiffs allege that, regardless of whether class members actually accepted, Provide transmitted class members' private payment information to Encore without consent. Encore would then enroll class members in a Rewards Program and charge their credit and debit cards a $1.95 activation fee and a $14.95 monthly fee. Plaintiffs allege that the Rewards Program provided no meaningful benefits and that class members were enrolled without knowledge or consent. *Id.* The plaintiffs' complaint calls this $15-off offer both a "coupon" and a "gift code." *E.g.,* ER218 (defining proposed subclass to include those who "clicked on a coupon offer…to receive a gift code"); ER202 ("coupon gift code," "coupon or gift code").

Plaintiffs' prayer for relief sought, among other things, compensatory, statutory, "exemplary and punitive" damages, and pre-judgment interest. ER246.

**B.     The settlement and fee request.**

Before hearings on a motions to dismiss parts of the Fourth Amended Consolidated Class Action Complaint were held, and before any motion for class certification, the parties proposed a settlement with a settlement class of approximately 1.3 million class members. Dkt. 227, 228, 248, 251; ER13.

The settlement had no injunctive relief. ER147. It provided a $12.5 million cash fund, which would pay for claims administration and notice fees and costs; $80,000 of incentive fees for the named plaintiffs; and $8.85 million in fees and expenses for the attorneys. ER153-54 (Settlement §2.1(a)-(c)). Defendants provided "clear sailing" and agreed not to challenge that fee request. ER153 (Settlement §2.1(c)). The remaining $3.5 million—after settlement administration and notice costs—would be available for class members who sought refunds through filling out a claim form of two pages of small print under penalty of perjury. ER154, ER191-94 (Settlement §2.1(d), Ex.D).

Any money left over in the settlement fund would be divvied between three San Diego-area universities, San Diego State University, University of California at San Diego, and University of San Diego School of Law, earmarked for programs regarding internet privacy or data security to be "developed and coordinated" between Provide and the universities. ER155 (Settlement §2.1(e).) The overwhelming majority of SDSU and UCSD students are California residents, and nearly half are from the San Diego area. ER103-07. The class notice (ER181-88 (Settlement Ex. B)) failed to disclose that lead plaintiffs' counsel James Patterson was an alumnus of University of San Diego School of Law. ER125.

But the bulk of the value that the parties ascribed to the settlement came from a coupon that the settlement called "$20 Credits" that would be distributed to each of the 1.3 million class members. ER150, 155 (Settlement §§1.1, 2.2). The "$20 Credits" were good for use only on four of Provide's websites and only for certain products; expired after one year; and were not valid during Christmas week, the ten days before Valentine's Day, or the first two weeks of May (Mother's Day). ER155 (Settlement §2.2). Moreover, the coupons were not "stackable"; nor could they be used in conjunction with any other offer. *Id.* Finally, the coupons had to be used in a single transaction: in the event a class member purchased something costing less than $20 on Provide's websites, there would be no change or credit given for the balance of the coupon. *Id.* The settlement prohibited defendants from taking a position on the total settlement value or the value of the coupons. *Id.* While the coupons were transferable, the settling parties submitted no evidence how much similarly transferable coupons sell for on such secondary markets as Ebay.

Class members would release the defendants from all claims relating to the Membership Programs. ER160-61 (Settlement §4.2).

On June 26, 2012, the district court, without any hearing or questioning of the parties, adopted the proposed schedule and notice, granted preliminary approval of the Settlement, and conditionally certified the class. Dkt. 252.

Class counsel made their Rule 23(h) request for $8.85 million in fees and expenses by claiming that it was a "reasonable percentage of a common fund settlement," which they valued at an "estimated $38 million value for a nationwide

Class of online consumers." Dkt. 255-1 at 5-6. As part of the crosscheck, class counsel asserted a lodestar of $4.26 million with a multiplier of about 2. *Id.* at 12.

## C.     Brian Perryman objects.

Brian Perryman was unknowingly enrolled in RedEnvelope Rewards during the class period on November 29, 2009, and his credit card was billed monthly fees for several months; he was thus a member of the class. ER142.

Perryman, who had never objected to a class action settlement before, contacted attorney Theodore H. Frank of the non-profit Center for Class Action Fairness to object to the settlement; a Center attorney appeared at the fairness hearing on Perryman's behalf. ER143, 100, 91, 40.

Perryman objected that the settlement was a coupon settlement, and a poor one at that. ER120-24. The coupons were not "functionally equivalent to cash," as plaintiffs alleged. Dkt. 255-1 at 10. The coupons could not be used during the holidays—Christmas, Valentines' Day, Mother's Day—when one would most likely want to purchase flowers or other gifts online. ER120. In particular, Perryman noted that the $20 face value of the coupons was illusory, because the opportunity cost of using the coupons meant that one could not use the 20% discounts that Provide offered as a matter of course. ER120, 142-43. For example, if Perryman were to purchase a $65 flower bouquet, he would pay $45 if he used the coupon, but $52 if he did not: the "$20" coupon thus only provided a savings of seven dollars in that instance. *Id.* The parties did not dispute that 20% discounts were regularly available at Provide retail websites.

Moreover, Perryman argued, the Class Action Fairness Act prohibited attorneys' fees based on the face value of a coupon, rather than on the actual value of the coupons redeemed by the class. ER121-24. The plaintiffs' suggestion that the coupons would have an 85% redemption rate was inconsistent with historical low-single-digit-percentage redemption rates, especially given the limitations on the use of these coupons. ER122-23.

Furthermore, Perryman argued, the *cy pres* provisions of the settlement were problematic. At least one of the lead class counsel had an undisclosed affiliation with one of the recipients; Perryman asked the Court to require the parties and lawyers to disclose any other ties with the recipients. ER126. Moreover, class counsel bragged that there was a "nationwide Class" (Dkt. 255-1 at 5-6), but the entirety of the *cy pres* was designated for universities in the court's geographic area—thousands of miles away from class members like Perryman. ER155.

Moreover, because the settlement fund was not large enough to compensate the entire class for all of the damages alleged in the complaint, Perryman protested that it would be inequitable to give any money to third-party *cy pres* recipients instead of prioritizing class recovery either by providing additional outreach to the class to encourage a higher claims rate or increasing the artificial cap on claimant recovery to include the punitive damages the complaint sought. ER127-29. At a minimum, Perryman argued, the court should discount the fee request for any *cy pres* awarded to avoid creating a perverse incentive where class counsel would prefer throttling the claims rate rather than reducing the amount the settlement provided their *alma mater*.

ER127. Perryman predicted that the class would be shortchanged with a 1-2% claims rate. ER128.

In fact, Perryman's objection was insufficiently cynical: the claims process was sufficiently burdensome, restrictive, and poorly noticed that only 3000 class members (0.2% of the class) made claims of about $225,000. ER86. As a result, class members came in a poor fourth, behind the attorneys' win ($8,850,000), the *cy pres*' place (over $3 million (ER45)), and the claims administrator's show (about $300,000), albeit barely ahead of the class representatives ($90,000). Thus, Perryman argued, the settlement was unfair: it was structured so that the class counsel would receive the disproportionate lion's share of the benefits, several times the value of what the class was receiving, and would double-dip by selecting *cy pres* recipients for which they would receive the indirect benefit of favoring their *alma mater* and local institutions. ER129-34, 138-39, 76-77.

In the course of responding to the objections, class counsel asserted that Perryman should be ignored because he was not a *bona fide* objector. Perryman and his counsel rebutted those assertions. ER92-93, 101. Though class counsel did not identify any factual basis for their accusation, the district court refused to impose Rule 11 sanctions. Dkt. 290.

**D.     The district court refuses to apply the Class Action Fairness Act and approves the settlement and $8.85 million attorney award.**

The district court approved the settlement and the $8.85 million attorney award. ER9-30.

With respect to Perryman's objections to the *cy pres* structure, the district court held that the *cy pres* to the attorneys' alma mater was an "appearance of impropriety [that] is not substantial"; "The objector has not shown that the proposed cy pres recipients have a significant connection, ongoing or past, with Class Counsel or Defendants' Counsel, or that any of them stand to benefit from any distribution to the cy pres recipients." ER19-20, 28. Nor did it find the geographic coincidence that all of the *cy pres* recipients were in the hometown of the court and class counsel problematic, because the institutions were "national," "serve a diverse student population of students from many states," and would benefit the entire Internet by providing the "next best" relief to the class; "the proposed *cy pres* recipients have the appropriate geographic scope given their enrollment and job placement statistics and the fact that this Action and the subject matter of the *cy pres* funds involve the internet, which lacks geographic scope." ER20-22, 28. Finally, it rejected the idea that the *cy pres* was excessive relative to the class recovery because any additional class recovery would be an "impermissible windfall" and "Silent class members will receive greater benefit from the remaining funds if they are distributed to schools for creating of internet privacy and security programs benefitting internet consumers such as themselves." ER22-23.

With respect to the coupons, the district court refused to apply the Class Action Fairness Act because class members were entitled to both cash reimbursement and the coupons. ER16. The district court cited no statutory authority for this proposition. It then made a factual finding "that the $20 credits, regardless of their

classification as coupons or credits, provide an actual value of $20 to the class members despite the blackout dates and inability to combine the credits with coupons and promotions." ER17. This valuation was because "the $20 credits here are transferrable and may be used to purchase entire items without requiring the class members to spend additional money" and "the $20 credits are in addition to the cash fund reimbursement available to all class members." *Id.* The court purported to engage in "rigorous scrutiny" of the settlement by "satisfy[ying] CAFA's requirement that a hearing be held and the Court's findings be in writing." *Id.*

The district court awarded the full attorney award request of $8.85 million, stating that it used the "common-fund method to calculate" the award, and valuing the settlement fund at $38 million: the full $12.5 million cash fund plus valuing the coupons at face value. ER28-29. The district court's valuation did not distinguish between the money going to the class and the money going to *cy pres*. Using a lodestar crosscheck, the district court held that a 2.1 multiplier was "reasonable and appropriate given the results achieved." ER29. Eight class representatives were awarded a total of $80,000. *Id.*

The district court issued final judgment, ER3-8, and this timely appeal followed. ER38-39. Though there was no factual evidence that costs on appeal could possibly be more than $2,000, ER35-37, the district court imposed a punitive appeal bond of $15,000, and ordered the appeal dismissed if the bond not paid. ER1-2. Perryman posted the bond and appealed the bond order. Dkt. 292; ER31-32.

## Summary of Argument

The district court approved a settlement that paid the attorneys double lodestar of $8.85 million, three local San Diego educational institutions about $3 million, and the 0.2% of the class that made claims approximately $225,000. It rationalized the fairness of this upside-down result by finding that the class members' recovery of $20 coupons had a value of twenty dollars each—directly contradicting the Class Action Fairness Act, which require such findings to "based on the value to class members of the coupons that are redeemed." 28 U.S.C. §1712; *In re HP Inkjet Printer Litig.*, No. 11-16097, -- F.3d --, 2013 WL 1986396 (9th Cir. May 15, 2013) ("*Inkjet*"). Even if CAFA's limitations on coupon settlements did not apply, the $20 valuation was clearly erroneous given that the coupons had restrictions that all but ensured that they would either not be used, or, when used, would be worth far less than $20.

Moreover, the *cy pres* in this settlement went entirely to San Diego universities, including the *alma mater* of class counsel, contrary to this Court's holding in *Nachshin*, 663 F.3d 1034. Finally, that $3 million went to third parties when there were undercompensated class members (including 99.8% of the class that received zero in cash) is especially objectionable; this Court should adopt the "last resort" rule and hold that distributions to class members have priority to distributions to *cy pres* when such distributions are feasible and would not result in a windfall.

## Preliminary Statement

Attorneys with the non-profit Center for Class Action Fairness are representing Perryman *pro bono*. The Center's mission is to litigate on behalf of class members

against unfair class-action procedures and settlements, and it has won millions of dollars for class members. *See, e.g.,* Brian Zabcik, *Conscientious Objector*, LITIGATION 11 (Spring 2013), *available at* http://is.gd/alm_frank2013 (redirect); Ashby Jones, *A Litigator Fights Class-Action Suits*, Wall St. J. (Oct. 31, 2011); *In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480, at *29 (W.D. Wash. Jun. 15, 2012) (praising CCAF's work).

Unfortunately, class counsel below resorted to inventing false *ad hominem* attacks against Perryman's non-profit counsel. ER92-98. In addition, they complain that Perryman's counsel "filed objections in well over 30 other class action settlements." Dkt. 262 at 14. Such *ad hominems* are, of course, irrelevant to the merits of Perryman's appeal, but, to the extent class counsel continues to argue that the identity of Perryman's non-profit counsel is somehow relevant, it cuts in favor of his arguments, as his counsel has achieved success in the majority of objections he has brought, including six of the eight federal appeals of class action settlements he has argued that have been decided as of this briefing, including all three in the Ninth Circuit. *E.g., Bluetooth*, *supra*; *Nachshin, supra*; *Inkjet, supra*; ER94.

The reference to multiple objections is perhaps an attempt to unfairly associate Perryman's objection with those of "professional objectors," for-profit attorneys who file objections to blackmail plaintiffs' attorneys for payment in exchange for withdrawing his or his objections. Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011) (distinguishing the Center from professional objectors); Edward

Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. Chi. Legal Forum 403, 437 n.150 (public interest groups are not "professional objectors"). Neither the Center nor any of its attorneys have ever agreed to a *quid pro quo* settlement of an objection. ER34.

The difference between a "professional objector" and a public-interest objector is a material one. Under the current federal rules, "professional objectors" have an incentive to file objections regardless of the merits of the settlement or the objection; they can profit from a meritless objection by being paid not to cause delay. In contrast, a non-profit public-interest attorney representing objectors must triage dozens of requests for *pro bono* representation, loses money on every losing objection (and most winning objections) brought, can only raise charitable donations necessary to remain afloat by demonstrating success, and has no interest in wasting limited resources and time on a meritless objection. ER95. This appeal is brought in good faith to overturn an unfair settlement and fee award that sacrifices the claims of Perryman and other class counsel for a gigantically disproportionate attorney fee, while diverting class money to inappropriate third parties.

## Argument

## I. The district court's failure to correctly value the coupons in this settlement led to reversible error in its approval of the settlement and attorney award.

The Class Action Fairness Act sets forth special rules for fee calculation and settlement valuation "[i]f a proposed settlement in a class action provides for recovery

of coupons to a class member." 28 U.S.C. §1712(a). The district court refused to apply these rules, creating an exception that not only appears nowhere in the statute, but contradicts the language of the statute. As a result, the district court valued coupons (likely worth less than $1 million to the class once redeemed and expired) at their full face value of $25.5 million. ER13, 29. The district court's error caused it to overestimate the value of the settlement by a factor of three and incorrectly conclude that attorneys were collecting only $8.85 million out of a $38 million settlement instead of the vast and disproportionate majority of a $13.5 million settlement. ER29.

## A.     A district court must protect absent class members' interests.

This Circuit's precedents call upon courts to consider an eight-factor test to evaluate the fairness of a settlement. *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). But "where, as here, a settlement agreement is negotiated prior to formal class certification, consideration of these eight *Churchill* factors alone is not enough to survive appellate review." *Bluetooth*, 654 F.3d at 946-47. This Court has reversed settlement approvals where the district court incorrectly applied the Class Action Fairness Act, notwithstanding any claims by appellees that the *Churchill Village* factors had been satisfied. *Inkjet*, 2013 WL 1986396.

"[W]here the court is '[c]onfronted with a request for settlement-only class certification,' the court must look to the factors 'designed to protect absentees.'" *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). "[S]ettlements that take place prior to formal class certification require a higher standard of fairness." *Molski*, 318 F.3d at 953 (quoting

*Dunleavy v. Nadler*, 213 F.3d 454, 458 (9th Cir. 2000) and citing *Hanlon*, 150 F.3d at 1026). "[P]re-certification settlement agreements require that we carefully review the entire settlement, paying special attention to 'terms of the agreement contain[ing] convincing indications that the incentives favoring pursuit of self-interest rather than the class's interest in fact influenced the outcome of the negotiations.'" *Dennis v. Kellogg Co.*, 697 F.3d 858, 867 (9th Cir. 2012) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003)).

Other circuits agree. A "district court ha[s] a fiduciary responsibility to the silent class members." *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987). "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (Posner, J.).

**B.     The Class Action Fairness Act does not make an exception for settlements with a recovery of coupons to a class member just because cash is also available in the settlement.**

### 1.     The "credits" are coupons.

Congress did not define the term "coupon" anywhere in CAFA. *See* 28 U.S.C. §1711 (definition section). "Where a statute does not define a key term, [courts] look to the word's ordinary meaning." *Inkjet,* 2013 WL 1986396, at *6 (citing *Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011)). A coupon is "[a]

code or detachable part of a ticket, card, or advertisement that entitles the holder to a certain benefit, such as a cash refund or a gift." American Heritage Dictionary of the English Language (5th ed. 2011). *Accord Synfuel v. DHL Express (USA)*, 463 F.3d 646, 654 (7th Cir. 2006) (Wood, J.) (A "discount on a proposed purchase" is typical coupon relief).

At issue in this case are the "$20 credits" that are emailed to every class member in the form of a merchandise code. ER12. These are coupons. The codes entitle class members to a "benefit": a $20 discount on merchandise. That they are called "credits" is irrelevant; the legal effect of the relief "is a question of function, not just labeling." *Khatib v. County of Orange*, 639 F.3d 898, 905 (9th Cir. 2011) (interpreting "jail" where RLUIPA was silent.). Myriad courts have correctly rejected the argument that the parties can evade CAFA through semantics and applied CAFA notwithstanding settling parties using a label other than "coupon."[2] This very Court in *Inkjet* is the most recent to do so, holding explicitly that "e-credits [are] a euphemism for coupons" and fully applying the dictates of CAFA's §1712 . *Inkjet*, 2013 WL 1986396, at *1. And perhaps most decisively, plaintiffs' complaint repeatedly uses the phrase "coupon" and "gift code" interchangeably to refer to the exact same offer at issue in the litigation. ER202 ("coupon gift code," "coupon or gift code"); ER218 (defining class to include those who "clicked on a coupon offer…to receive a

---

[2] *See, e.g.*, *Fleury v. Richemont N. Am.*, No. C-05-4545-EMC, 2008 U.S. Dist. LEXIS 112459 (N.D. Cal. Aug. 6, 2008) ("credits"); *Galloway v. Kan. City Landsmen, LLC*, No. 4:11-1020-cv-W-DGK, 2012 U.S. Dist. LEXIS 147148, at *10 (W.D. Mo. Oct. 12, 2012) ("certificates").

gift code"); ER212 ("coupon"); ER214 (same); ER225 ("savings coupon"); ER233 ("coupons"); ER208 (describing coupon offer as a "gift code"); ER211 (same).

The parties argued below that because the "credits" can be used to purchase an entire product[3] that they are not really coupons. This argument has no basis in any dictionary definition, nor in the statutory text or the legislative history, the latter of which cites multiple cases where class members received entire products. *See Inkjet*, 2013 WL 1986396, at *4 (citing S. Rep. No. 109-14 (2005), which includes examples such as a free crib repair kit, free spring water, and free golf gloves or golf balls); *Fleury v. Richemont North Am., Inc.*, No. C-05-4525 EMC, 2008 WL 3287154, at *2 (N.D. Cal. Aug. 6, 2008). §1712 was born of the recognition that "[c]ompensation in kind is worth less than cash of the same nominal value." *Synfuel*, 463 F.3d at 654. Indeed, the coupons in *Synfuel* were for free "pre-paid Letter Express packages" that did not require class members to purchase anything; the Seventh Circuit correctly recognized that they should be treated as if they were coupons. *Id.* at 649, 654. For this Court to do differently would create a circuit split—which the Ninth Circuit does only upon "painstaking inquiry." *Zimmerman v. Oregon Dep't of Justice*, 170 F.3d 1169, 1184 (9th Cir. 1999). There is no basis for a circuit split here.

---

[3] As a factual matter, these $20 coupons could wholly satisfy purchase and shipping costs of only a handful of the thousands of products offered on the defendants' websites; the parties submitted no record evidence identifying *any* specific products that the coupons could purchase. Moreover, if the total purchase price was less than $20, the remainder of the $20 face value of the coupon could not be used elsewhere. ER155.

Moreover, the "whole product" argument ignores the primary problem with coupons; that they "mask[] the relative payment of the class counsel as compared to the amount of money actually received by the class members." *Inkjet*, 2013 WL 1986396, at *4 (quoting Christopher R. Leslie, *A Market-Based Approach to Coupon Settlements in Antitrust and Consumer Class Action Litigation*, 49 UCLA L. Rev. 991, 1049 (2002)). "[C]ourts aim to tether the value of an attorneys' fees award to the value of the class recovery… Where both the class and its attorneys are paid in cash, this task is fairly effortless… But where class counsel is paid in cash, and the class is paid in some other way, for example, with coupons, comparing the value of the fees with the value of the recovery is substantially more difficult." *Inkjet*, 2013 WL 1986396, at *3-*4.

In just this manner, coupons were deployed here to mask what was really a $12.5 million total settlement value, of which class counsel was disproportionately absconding with more than two thirds. The district court failed to see through the ruse. ER29 (calculating fees as a percentage of the $38 million "reasonable value" of the fund). Class counsel's fee request and award here were faultily premised on the nearly face value of the coupons, allowing precisely "the inequities" that "§1712 intended to put an end to." *Inkjet*, 2013 WL 1986396, at *4. "This point cannot be overemphasized for we can only properly interpret CAFA's text if we keep the statute's purposes clearly in mind." *Id.*

24

### 2. Settlements that provide the recovery of coupons, whether or not other relief is offered, are governed by the Class Action Fairness Act.

"If a proposed settlement in a class action provides for a recovery of coupons to a class member," then it is governed by CAFA. 28 U.S.C. §1712(a)-(c); *accord* §1712(e). That is the proper inquiry. Nonetheless, the district court spent much energy trying to determine whether or not the settlement ontologically constitutes the Platonic ideal of a "coupon settlement." ER15-17. This is misguided; the phrase "coupon settlement" does not appear in the text of §1712. It appears in the titles of subsections (a), (b), (c), and (e), but "the Supreme Court has cautioned that 'the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Northstar Financial Advisors, Inc. v. Schwab Investments*, 615 F.3d 1106, 1120 (9th Cir. 2010) (quoting *Brotherhood of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 528-29 (1947)). Here, the proposed settlement provides a $20 coupon to every class member. Section 1712 applies.

Even if we assume that the district court's inquiry into whether the settlement is a "coupon settlement" is a relevant one, the district court comes to the wrong conclusion. The district court held that because "there is also a cash fund that provides reimbursement to class members…[t]he proposed settlement is . . . not entirely a 'coupon' settlement and distinguishable from other cases involving coupons or vouchers without an accompanying cash fund." ER15-16. The district court is drawing a distinction that makes no difference under the statute. Whether or not the settlement includes a cash fund, adding coupons on top "provides class counsel with

the opportunity to puff the perceived value of the settlement so as to enhance their own compensation." *Inkjet*, 2013 WL 1986396, at *4; *see also* Leslie, *supra*, at 1049.

Such an argument is also refuted by the plain text of §1712. Subsection (a) discusses "the **portion** of any attorney's fee award… that is attributable to the award of coupons" (emphasis added). Thus, CAFA itself has determined that settlements that create non-coupon value in addition to coupon value (*i.e.* those where a separate **portion** of the attorney's fee award is attributable to non-coupon relief) still fall within its ambit.

The district court attempted to analogize this settlement to others where class members had the option to choose *between* cash and coupons. ER16 (citing *Shames v. Hertz*, No. 07-CV-2174, 2012 WL 5392159, at *16 (S.D. Cal. Nov. 5, 2012) and *CLRB Hanson Indus., LLC v. Weiss & Assocs., PC*, 465 Fed. Appx. 617, 619 (9th Cir. 2012) (unpublished)). But both of those decisions made the same mistake: thinking that CAFA applied only to "coupon settlements" (and thus only settlements that had only coupons) rather than to all settlements that include an "award of coupons" as a portion of the relief. Section 1712(a), by its own terms, applies settlements that offer more than just coupons. The non-binding *Shames* and *CLRB Hanson* decisions—along with the district court—improperly read that language out of the statute. Moreover, the only published appellate decision on the issue agrees with Perryman. In *Synfuel*, class members could choose between a cash payment and a coupon. 463 F.3d at 649. The Seventh Circuit correctly recognized that the coupons were coupons. *Id.* at 654. For this Court to do differently would create a circuit split, and again there is no

reason to do so. *Synfuel* was a pre-CAFA case, but nothing in the statute suggests that it abrogates *Synfuel*'s analysis to narrow the definition of coupons. Section 1712, indeed, expressly contradicts the district court with its "portion" and "award of coupons" language.[4]

Where there is "a portion of [the] attorney's fee award . . . that is attributable to the award of the coupons," 28 U.S.C. §1712(a), a court must scrutinize that portion of the attorney's fee and base it "on the value to class members of the coupons that are redeemed." *Id.*; *Inkjet*, 2013 WL 1986396, at *6-*9. There is simply no statutory authority for the district court's decision to ignore that language; this was reversible error.

## C.    CAFA requires that coupons be valued at "the value to class members of the coupons that are redeemed." The district court thus erred as a matter of law by valuing this settlement's coupons at face value.

Because of the inherent dangers of settlements that award coupons, CAFA requires a district court to base "the portion of any attorney's fee . . . attributable to the award of coupons" on "the value to class members of the coupons that are redeemed." 28 U.S.C. §1712(a). *Cf. also* Thomas A. Dickerson, *Class Actions: The Law of*

---

[4] *Shames* and *CLRB Hanson* contradict §1712 and *Synfuel*, and are wrong. But even if they were correct, there is an important distinction between those cases and this one. In *Shames* and *CLRB Hanson*, class members were given a choice of accepting cash/cash-equivalents or coupons. In this settlement, class members are not permitted to claim the coupons' purported $20 value in cash, they are forced to accept it in scrip. Although there is an additional cash benefit available on the side for the 0.2% of class members that filled out a claim form, the coupon component of this settlement (a supposed $25 million+ value) is not interchangeable with cash.

*50 States* §9.03[1], at 9-39 to 9-40 (2005) ("In evaluating the merit of a non-cash settlement, the only proper means of measuring true value is by estimating the actual redemption rate.").

*Inkjet* confirmed this understanding. Where the fee award is a "consequence" of the award of coupons, or conversely, where the award of coupons is a "condition precedent" to the award of fees, the fee award must be calculated based on the value of the coupons redeemed. *Inkjet*, 2013 WL 1986396, at *6. There is no dispute that the fee award was "attributable" to the coupons in these senses, because the court below explicitly included the value of the coupon in its valuation of the common fund. ER13, 29. Thus, it is worth noting that even under the *Inkjet* dissent's interpretation of CAFA, the fee award here violated §1712. *Contrast Inkjet*, 2013 WL 1986396, at *16 (Berzon, J., dissenting) (§1712(a) requires…that *if* fees are calculated as a percentage of the value of the coupons awarded, that value must comprise only redeemed coupons), *with* ER29 (acknowledging that district court "used the common-fund method to calculate the attorneys' fees award…").

Coupon valuations based on clairvoyance not only violate §1712(a), as interpreted by the *Inkjet* majority and dissent, they also implicitly contravene §1712(e). Section 1712(e) authorizes the district court to "require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties" but stipulates that such secondary distribution "shall not be used to calculate attorneys' fees under this section." It would be utterly irrational if the §1712 legislative

scheme permitted fees to be paid on the value of unclaimed coupons that reverted to the defendant, but not on the value of those unclaimed coupons that were redistributed to a third-party charity. In interpreting a statute, "[a]bsurd results are to be avoided." *McNeill v. United States*, 131 S. Ct. 2218, 2223 (2011) (internal quotation omitted). To harmonize the results here, fees must be paid neither on unclaimed coupons that are redistributed to third-parties, nor on unclaimed coupons that revert to the defendant.

Here, however, the district court "conclude[d] that the class members [would] receive $20 in value" from the credits, ER17, but it did not even attempt to determine the value to class members of *redeemed* coupons. That is reversible error. *Inkjet, supra*. Because the fee award is based on the coupon relief to the class, that portion of the award must be deferred until the court can determine the value of the coupons actually redeemed.

## D.    Even if CAFA did not apply, the district court's valuation of the coupon at face value is clearly erroneous.

Even if this Court were to hold that a district court could calculate coupon value *ex ante* rather than wait for redemption rate to be known, the district court's valuation methodology constitutes clear error. As a matter of law, "compensation in kind is worth less than cash of the same nominal value." *Synfuel*, 463 F.3d at 654 (quoting *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001)) (pre-CAFA). The coupons here burden redemption in a variety of ways. Most notably, they are not valid around Christmas, Valentine's Day, or Mother's Day, the three most

popular flower-buying holidays. ER14-15. Such blackout-date provisions have been the subject of critique by courts and commentators. *See, e.g.*, *Galloway v. Kan. City Landsmen*, No. 4:11-1020-CV-W-DGK, 2012 U.S. Dist. LEXIS 1471148, at *17 (W.D. Mo. Oct. 12, 2012) (finding the black-out period especially problematic because it was timed "when many consumers [were] most likely to [use coupons for car rental].");
Leslie, *supra*, at 1025 (airline travel) ("Perhaps the clearest example of restricting settlement coupons to inferior goods is the imposition of blackout dates on the… Coupons… The blackout dates significantly reduced the coupons' value to the average class member."). Burdens like this are a principal reason that "CAFA requires greater scrutiny of coupon settlements." *Inkjet*, 2013 WL 1986396, at *3 (quoting S. Rep. No. 109-14, at 27).

Instead, the district court "afforded significant weight" to defendants' argument that the blackout dates were necessary because "distributors find it difficult to fulfill the number of flower orders received during these time periods." ER 17. But that fact should have indicated to the court that it is precisely during these periods that, for most class members, the coupon had the most value. One would imagine that there are sound business reasons for every single restriction on the use of coupons; that should not stop the court from realizing that every restriction on a coupon reduces its value to consumers. The district court's reasoning for refusing to discount the coupons—the parties reasonably compromised to create limitations on the coupons, because otherwise class members might actually ***use*** the coupons—is exactly backwards.

Most importantly, the coupons are not combinable with other discounts, gift codes, and promotions, ER155, which further reduces their value to class members. *See Inkjet*, 2013 WL 1986396, at *4 ("[A] coupon settlement is likely to provide less value to class members if, like here, the coupons…cannot be aggregated.") (citing *Leslie*, *supra*, at 1014-27). The defendants continue to—independently before and after settlement—make coupons available as part of promotional marketing campaign. ER141-46. The external campaign severely diminishes the value of the settlement's coupons. *See* Federal Judicial Center, *Managing Class Action Litig.: A Pocket Guide for Judges*,[5] 34 (3d ed. 2010) ("If similar discounts are provided to consumers outside of the class, the benefit to the class might be less than the face amount of the coupon— or perhaps no benefit at all."). ProFlowers regularly offers a 20% discount on orders of $39 or more. So a class member wishing to purchase a $65 order from ProFlowers has a choice of using the $20 coupon and paying $45; or not using the coupon and paying $52. For such a class member, the "$20" coupon saves them $7. If the class member is making a purchase of an arrangement worth more than $100, the coupon is entirely worthless. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (it is "the *incremental* benefits" that matter, "not the total benefits" (emphasis in original)).

The district court ignored this, theorizing that it was hypothetically possible for a class member to use the coupon to purchase one of the handful of goods where the full price including shipping was less than $20 "so the credits do not have to serve as

---

[5] Available at http://is.gd/PocketGuideForJudges (redirect to FJC website).

discounts on larger purchases." ER17. As an initial matter, there was no record evidence how often Provide customers purchased goods for so little money; the parties simply asserted that it was conceivably possible for class members to do so, which hardly carries the burden. But even permitting the settling parties to assert the factually incorrect claim without any record evidence, the district court's analysis was clearly erroneous for two additional reasons. *First*, if a class member used the $20 coupon to get a $12 item for free, the remaining $8 on the coupon was forfeited—the coupon would be worth only $12, not $20. ER155 (Settlement §2.2). *Second*, the possibility that a class member *could hypothetically* use a $20 coupon to purchase an overpriced teddy-bear for, say, $19.37, does not make every single coupon worth $20, given the certainty that at least some class members would use the coupons in a manner that would make the coupons worth less than $20—or, as discussed below, never use the coupons at all.

So although the coupons are fully transferable, as a market-maker in coupons has stated, "transferability alone doesn't do it. You need somebody there to buy and sell these coupons from the class members or they simply don't redeem them." James Tharin, *FTC Workshop—Protecting Consumer Interests in Class Actions, September 13-14, 2004: Workshop Transcript: Panel 3: Clear Notices, Claims Administration, and Market Makers, in* 18 Geo. J. Legal Ethics 1223, 1236 (2005). Few will be willing to buy duplicative, relatively low value coupons that are neither stackable, nor usable on the chief gift-giving holidays; any secondary market will offer a small fraction of the face value of the coupon. (The settling parties submitted no evidence how much similarly

transferable coupons sell for on such secondary markets as Ebay.) The coupon is plainly not worth face value; nor would anyone pay face value if the coupon were transferred, because to do so would be inferior to the free coupons Provide provides. *Compare Inkjet*, 2013 WL 1986396, at *4 n.6 (noting that evidence of better deals in the marketplace "tends to show that the redemption rate…may be very low.").

It is exceedingly unlikely that the redemption rate would be anywhere close to 100%. A single-digit percentage rate of redemption is far more likely. "[R]edemption rates are tiny" "typically mirror[ing] the annual corporate issued promotional coupon redemption rates of 1-3%." James Tharin & Brian Blockovich, *Coupons and the Class Action Fairness Act*, 18 Geo. J. Legal Ethics 1443, 1445, 1448 (2005); *see also* 28 U.S.C. §1711, note §2(a)(3)(A). Cases abound in which few class members redeem their coupons.[6]

Coupon redemption rates "may be particularly low in cases involving low value coupons." *Sobel v. Hertz Corp.*, No. 3:06-cv-00545-LRH, 2011 U.S. Dist. LEXIS 68984,

---

[6] *See, e.g., True v. American Honda Motor Co.*, 749 F. Supp. 2d 1052, 1074-75 (C.D. Cal. 2010) (rebuffing witness's suggested redemption rate and citing two cases with redemption rates under 2%); *Moody v. Sears Roebuck & Co.*, 664 S.E.2d 569, 572, 574 (N.C. App. 2008) (317 valid claims filed out of 1,500,000-member class, for total of $2,402 in total redemption of coupons); *Union Fidelity Life Ins. Co. v. McCurdy*, 781 So.2d 186, 188 (Ala. 2000) (113 redemptions out of 104,000 member class); Jeff Feeley & Myron Levin, *Ford Accord Garners Less Than 1 Percent Participation*, Bloomberg (July 7, 2009) (75 $500 coupons redeemed out of class of 1 million); Steven B. Hantler & Robert E. Norton*, Coupon Settlements: The Emperor's Clothes of Class Actions*, 18 Geo. J. Legal Ethics 1343, 1347 (2005) (noting one settlement where only 2 of more than 96,000 coupons were redeemed).

at *35-*38 (D. Nev. Jun. 27, 2011) ($10 discount "certificate" for car rental). If one generously assumes a redemption rate of ten percent despite the complete lack of evidence of any likelihood that any coupons would be redeemed, and one generously assumes that the average redeemed value of a $20 credit is $10 (and again, Provide offered no evidence that the stackability limitations would not create far lower valuations in practice), then the actual value of the coupons would be only $1.3 million. If the redemption rate is a more typical 1 to 3%, then the coupons are worth only $130,000 to $390,000. And if one makes the not-unreasonable assumption that the redemption rate for the coupons is equal to the claims rate in this case—0.2%—the coupons are worth only $26,000.[7]

Both of the district court's assumptions in valuing the coupons—a 100% redemption rate and a full incremental value of $20 for every class member when

---

[7] Shockingly, the settlement prohibited defendants from taking a position on the total settlement value or the value of the $20 Credit (ER153 (Settlement §2.1(c)))—perhaps specifically anticipating that if defendants did so, they would provide information that would demonstrate that the coupons were unlikely to be redeemed, and certainly not be worth $20 when redeemed. Perryman objected that this "premium clear-sailing agreement" was a warning sign of an unfair settlement. ER133 (citing *inter alia*, *Bluetooth*, 654 F.3d at 947). The harm of the clear-sailing agreement was particularly prejudicial here: because Provide offered $15 coupons to induce people to unwittingly be billed by its EasySaver program (ER10, 16, 28), it thus surely had data about historical redemption rates in its possession. Even without §1712(e)'s requirement of additional scrutiny, an adverse inference was required—especially because plaintiffs' complaint explicitly alleged that the $15 EasySaver coupons were not "meaningful benefits." ER206 (noting use of $15 gift code to induce membership signups); ER224 (membership program did not provide class members "with any meaningful benefits").

used—are clearly erroneous and have no record support. Even if this Court goes against existing precedent and holds that the district court complied with §1712, the district court's evaluation of the settlement still requires remand.

## II.   The settlement's *cy pres* provisions unfairly favored local institutions and entities affiliated with class counsel over the class.

The legal construct of *cy pres* (from the French "*cy pres comme possible*"—"as near as possible") has its origins in trust law as a vehicle to realize the intent of a settlor whose trust cannot be implemented according to its literal terms. *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011). Imported to the class action context, it has become a increasingly popular method of distributing settlement funds to non-class third parties in lieu of class members. *Lane v. Facebook, Inc.*, 709 F.3d 791, 793 (9th Cir. 2013) (Smith, J., *dissenting from denial of rehearing en banc*). Still, non-compensatory *cy pres* distributions, disfavored among both courts and commentators alike, remain an inferior avenue of last resort. *See e.g., Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012) (*cy pres* settlement can easily become "a paper tiger"); *Nachshin*, 663 F.3d at 1038 ("[A] growing number of scholars and courts have observed, the cy pres doctrine…poses many nascent dangers to the fairness of the distribution process") (citing authorities); *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003) (holding *cy pres* to be an inadequate substitute for individual compensation); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) ("Cy pres distributions imperfectly serve that purpose by substituting for that direct compensation an indirect benefit that is at best attenuated and at worse illusory"); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th

Cir. 2004) ("There is no indirect benefit to the class from the defendant's giving the money to someone else."); *American Law Institute, Principles of the Law of Aggregate Litigation* ("*ALI Principles*") §3.07 cmt b (2010) (rejecting position that "cy pres remedy is preferable to further distributions to class members").

Section 2.1(e) of the Settlement Agreement governs the *cy pres* distribution of the remainder of the $12.5 million cash fund. ER155. The unclaimed portion of the gross fund will be donated in equal shares to three California academic institutions to fund programs regarding internet privacy and security, to be administered by Provide: San Diego State University, UC San Diego, and San Diego School of Law. *Id.* At the fairness hearing it was revealed that each institution would receive approximately $1 million, for a total of $3 million, more than thirteen times the amount ($225,000) received by class members. ER45, 75-76, 82, 85, 86.

Three defects make this application of *cy pres* insupportable: 1) There is an intolerable conflict of interest for class counsel owing to a preexisting relationship with a *cy pres* beneficiary; 2) there is an impermissible geographic discontinuity between the composition of the class (nationwide) and the locus of the *cy pres* recipients (San Diego); and 3) *cy pres* is improper when it is feasible to make further distributions to class members, at least when such distributions do not result in a legal windfall.

**A.** ***Cy pres* beneficiaries should not have a pre-existing relationship with class counsel.**

"Cy pres distributions present a particular danger" that "incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of negotiations." *Dennis*, 858 F.3d at 867. "The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel." *Radcliffe v. Experian Info. Solutions*, -- F.3d --, 2013 U.S. App. LEXIS 9126, at *22-*23 (9th Cir. May 2, 2013) (internal quotation omitted). Below, Perryman apprised the district court that lead plaintiffs' counsel James Patterson and defense counsel Michelle Doolin were both graduates of *cy pres* beneficiary USD Law, a fact that had not been disclosed in the class notice.[8] ER126; ER181.

Addressing Perryman's objection, however, the court declared it "not particularly surprising" that counsel's *alma mater* was a *cy pres* recipient, and concluded that "the appearance of impropriety is not substantial." ER19-20. In doing so, the court neglected to remark upon *Nachshin*'s distinct suggestions that *alma mater* dispensations are exactly the sort of conflicts of interest that are problematic. 663 F.3d at 1039. Instead, distinguishing and departing from the considered opinions of several other courts, it decided to permit the diversion of the settlement fund to class counsel's *alma mater*.

---

[8] There may have been further conflicts of interest and pre-existing relationships; the district court ignored Perryman's request (ER126) to require the parties and attorneys to disclose to the class other pre-existing relationships.

Alone, this should make the *cy pres* untenable: "A *cy pres* remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the award was made on the merits." *ALI Principles* §3.07 cmt. (b). As the leading law review article notes, such *cy pres* awards "can also increase the likelihood and absolute amount of attorneys' fees awarded without directly, or even indirectly, benefitting the plaintiff." Martin H. Redish et al., *Cy Pres Relief & the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617, 661 (2010). Other commentators are in accord, specifically identifying the *alma mater* problem as the type of conflict that is objectionable. *E.g.*, George Krueger & Judd Serotta, Op-Ed, *Our Class-Action System is Unconstitutional*, WALL ST. J., Aug. 6, 2008 ("Judges…have occasionally been known to order a distribution to some place like their own alma mater …"); Adam Liptak, *Doling out Other People's Money*, N.Y. TIMES, Nov. 26, 2007 ("Lawyers and judges have grown used to controlling these pots of money, and they enjoy distributing them to favored charities, alma maters and the like."). In *Nachshin*, this Court cited each of these three sources approvingly. 663 F.3d at 1039, 1039 n.2.[9]

---

[9] An all too rare best practice that mitigates this problem is to poll class members—efficiently done through the settlement website—as to which charities should be designated *cy pres* beneficiaries. *See, e.g., In re Wells Fargo Sec. Litig.*, 991 F. Supp. 1193, 1197 (N.D. Cal. 1998) (Walker, J.) ("The fact remains that this money belongs to class members, and it is they who should decide whether and to whom to donate it."); *see generally* Alexandra D. Lahav, *Two Views of the Class Action*, 79 Fordham L. Rev. 1939, 1961-63 (2011) (recommending polling the class as a "modest proposal" to increase class members' voice).

Recently, a divided panel of this Circuit affirmed a *cy pres* distribution over an objector's challenge to the fact that the beneficiary was closely affiliated with the defendant. *Lane v. Facebook*, 696 F.3d 811 (9th Cir. 2012), *rehearing en banc den'd*, 709 F.3d 791 (2013). That decision has no bearing on a distribution that raises conflicts between *class counsel* and the recipient. The rationale by which the *Lane* court sanctioned the *cy pres* award—that the terms of the settlement are "the offspring of compromise" that "necessarily reflect the interest of **both** parties"—has no application to a distribution that unjustifiably favors non-party class counsel. 696 F.3d at 821 (emphasis added). Put simply, the only entities that should be getting concessions in settlement terms are the class itself and the defendant, not class counsel at the expense of the class. Providing non-pecuniary benefits to class counsel—in addition to attorneys' fees based on the size of those self-dealing benefits—is double-dipping, and should be *per se* impermissible.

This Court has already criticized *alma mater cy pres* distributions in *Nachshin*; a bright-line rule forbidding them is the best way to ensure that improper ones do not occur. Moreover, this Court should not only reverse, but go further and require certifications that there are no such pre-existing relationships when parties propose *cy pres* beneficiaries; it is obviously problematic if it is permissible for attorneys to hide such conflicts from the class and the court.

**B.    "Next best" *cy pres* for a nationwide class should have nationwide scope.**

Another dispositive deficiency of the *cy pres* award is its failure to account for the "broad geographic distribution of the class." *Nachshin*, 663 F.3d at 1040. *Nachshin* reversed settlement approval where two thirds of the donations were made to local institutions. *Id.* In *Nachshin*, this Court planted its flag with the Seventh and Eighth Circuit by requiring geographic congruence between the class and the *cy pres* beneficiary. *Id.* (citing *In re Airline Ticket Commission Antitrust Litig.*, 268 F.3d 619, 625-26 (8th Cir. 2001) (concluding that the distribution of unclaimed funds to Minnesota **law schools** and charities was an abuse of discretion); *Houck v. Folding Carton Admin. Comm.*, 881 F.2d 494, 502 (7th Cir. 1989) (invalidating settlement agreement, in a national antitrust class action, that made a *cy pres* distribution to **local law schools**, and directing the district court to "consider to some degree a broader nationwide use of its cy pres discretion")).

It follows *a fortiori* from *Nachshin* that it is impermissible that each and every *cy pres* recipients is local. The plaintiffs argued below, and the district court accepted, that the local centralization was permissible because the recipients engage in a nationwide dialogue and place students from across the country. ER21. The defendant's own record submissions confuted this very claim by demonstrating 92.5% of San Diego State undergraduate enrollees are from in-state. ER106.

Moreover, even if student enrollment or faculty employment were more geographically balanced, it would do nothing to distinguish this award from the ones to local universities that the Seventh and Eighth Circuit unanimously rejected in

*Houck* and *Airline Ticket Comm'n* respectively. In *Houck*, for example, the *cy pres* proposed was to "research projects in the area of class actions, and particularly antitrust law," research that theoretically would have a nationwide benefit to all consumers interested in antitrust enforcement. 881 F.2d at 502. But that didn't prevent the Seventh Circuit from reversing on account of the concentration at schools local to Chicago. *Id.* Thus, by preventing unjustifiable localizations of benefit, geographical restrictions on *cy pres* work in conjunction with the Class Action Fairness Act of 2005. 28 U.S.C. §1714 (proscribing favoritism toward segments of the class based on geographic proximity to the court).

Nonetheless, rather than following the Seventh and Eighth circuit decisions—both of which formed the predicate for *Nachshin*—the district court narrowed the application of *Nachshin*'s holding to situations in which local recipients also have no tie to the subject matter of the underlying claims, nor have any ability to make a nationwide impact. ER21. Although it is truism in today's internet age that few organizations are truly local, that does not mean that courts should countenance grossly disproportionate concentrations of *cy pres* proceeds within a single community, municipality or state. Similar to state and sub-state governmental organizations, San Diego-area universities exist to serve primarily their local constituency.[10] The tripartite distribution to exclusively San Diego-area schools may have been too

---

[10] UC San Diego, in fact, as a member of the UC system, is part of an independent branch of state government under Article IX, §9 of the California Constitution. In a sense, contrary to *Nachshin*, this amounts to escheating funds to California state coffers rather than the U.S. Treasury. *See Nachshin*, 663 F.3d at 1041.

concentrated even if the class consisted entirely of citizens from throughout California, let alone the nation here.

This is not just good law, but sound public policy to avoid the sorts of abuses endemic to *cy pres*. *E.g.,* Redish, *supra*; Sam Yospe, *Cy Pres Distributions in Class Action Settlements*, 2009 Columbia Bus. L. Rev. 1014, 1030-31; *Examination of Litigation Abuse: Hearing Before the Subcommittee on the Constitution and Civil Justice of the House Comm. On the Judiciary*, 113th Cong. (Mar. 13, 2013) (written testimony of John H. Beisner and Theodore H. Frank).

Affirming the holding below would occasion a direct circuit split with the Seventh and Eighth Circuits, while undermining the *ratio decidendi* of *Nachshin*.

## C.    This Court should endorse the Fifth Circuit and ALI holding that *cy pres* is a "last resort" inappropriate when there are undercompensated class members.

Finally, Perryman objected that there was no reason to utilize *cy pres* at all given the many feasible ways to distribute the fund's $3 million remainder to absent class members, who had claimed only $225,000. ER127-29 (describing non-exhaustive list of alternatives available to the parties and the court).

This Court should endorse the American Law Institute's "last resort" rule:

> "If the settlement involves individual distributions to class members and funds remain after distributions (because some class members could not be identified or chose not to participate), the settlement should presumptively provide for further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or

other specific reasons exist that would make such further distributions impossible or unfair." *ALI Principles* §3.07(b).[11]

This rule follows from the precept that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011); *accord ALI Principles* §3.07 cmt. (b). *Klier* forbade the *cy pres* distribution of leftover settlement funds when it was feasible to provide a second distribution to undercompensated class members.

Granted, one appellate court, *Baby Products*, refused to go as far as *Klier* and §3.07: "Although we agree with the ALI that *cy pres* distributions are most appropriate where further individual distributions are economically infeasible, we decline to hold that *cy pres* distributions are only appropriate in this context." 708 F.3d at 173. But even if this Court chooses to follow the Third Circuit rather than Fifth Circuit and the ALI, the settlement approval below is problematic. While *Baby Products* did not endorse the last resort rule, it did hold that courts must be skeptical of settlements where the *cy pres* beneficiaries are appearing to profit at the expense of the class:

> We caution, however, that direct distributions to the class are preferred over *cy pres* distributions. The private causes of action aggregated in this class action—as in many others—were created by Congress to allow plaintiffs to recover compensatory damages for their injuries. [citation to antitrust laws omitted] *Cy pres* distributions imperfectly serve that purpose by substituting for

---

[11] Numerous courts have endorsed §3.07 to greater or lesser degree. *Nachshin*, 663 F.3d at 1039 n.2; *In re Lupron Mkt'g and Sales Practices Litig.*, 677 F.3d 21, 32-33 (1st Cir. 2012); *Klier*, 658 F.3d at 474-75 & nn. 14-16; *Masters v. Wilhemina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007) (citing draft version); *Baby Products*, 708 F.3d at 173 (agreeing in part).

> that direct compensation an indirect benefit that is at best attenuated and at worse illusory. *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784-85 (7th Cir. 2004). *Cy pres* distributions also present a potential conflict of interest between class counsel and their clients because the inclusion of a *cy pres* distribution may increase a settlement fund, and with it attorneys' fees, without increasing the direct benefit to the class.

*Id.* (interesting footnote omitted). "Class members are not indifferent to whether funds are distributed to them or to *cy pres* recipients, and class counsel should not be either." *Id.* at 174. Therefore, "one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class." *Id.* "Barring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds." *Id.* If *cy pres* is an excessive share of the total relative to direct class recovery, a district court should consider whether to

> urge the parties to implement a settlement structure that attempts to maintain an appropriate balance between payments to the class and *cy pres* awards. For instance, it could condition approval of a settlement on the inclusion of a mechanism for additional payouts to individual class members if the number of claimants turns out to be insufficient to deplete a significant portion of the total settlement fund.

*Id.*

Here, however, the *cy pres* constituted about 93% of funds available after payment of notice, administration and attorneys' fees and expenses, because only 0.2% of the class made claims under the parties' noticing and claims process. The following table indicates how this settlement is more lopsided than the settlement reversed in *Baby Products*:

|  | *Baby Products* | *EasySaver*[12] |
|---|---|---|
| Gross settlement fund | $35.5 million | $12.5 million + coupons |
| Direct class benefit | less than $3 million | $225,000 + coupons |
| Rule 23(h) award | $14 million | $8.85 million |
| Ratio of attorney recovery to class recovery | about 4.7 | about 40 |
| Approximate *cy pres* | $16.5 to $18.5 million | $3 million |
| Ratio of *cy pres* to class recovery | about 6 | about 13 |
| Percentage going to class | about 8% | 1.8% |
| Percentage going to attorneys | 39% | 70% |
| Percentage going to *cy pres* | about 46% - 52% | about 24% |

If it was apathy toward class members or—worse yet—preference for non-class third-parties that drove the decision to prioritize *cy pres* distributions, that casts doubt on the adequacy of class representation. "The premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members." *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 338 (4th Cir. 1998); *cf. also Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 834-35 (9th Cir. 1976)

---

12 In accordance with *Inkjet*, *see* Section I.C above, this chart treats yet-unredeemed coupons as a nullity. But even if one were to make the generous assumption that the coupons would eventually be worth $1.3 million to the class (*see* Section I.D above), the class would be getting 11%, the attorneys 64%, and the *cy pres* about 22%. In fact, the coupons are likely to be worth far less than $1.3 million given typical redemption rates.

(stating that "a proposed class ... is not a legal entity," and that the "class attorney continues to have responsibilities to each individual member of the class.").[13]

But again, the district court accepted the parties' justification for the *cy pres*—that further payouts to the class "would constitute an impermissible windfall for the claimant class members at the expense of the silent class members." ER22-23. Immediately, this rationale overlooks the possibility of employing methods that would compensate those absent class members who had not yet submitted any claim (*e.g.,* supplemental notice and outreach, sampling for lottery payout, or perhaps a direct distribution of some kind). It is thus both legally and factually erroneous in the absence of a showing that the 99.8% of class members who did not make claims had no claims to be made—an argument that directly contradicts the class allegations in the complaint.

---

[13] As Perryman argued below (ER127), one way to properly incentivize class counsel to put the class's interests first is to require a discounting of the settlement value so that a dollar to *cy pres* is not treated as valuable as a dollar that a class member actually receives. Permitting class counsel to treat *cy pres* as full class recovery "threatens to undermine the due process interests of absent class members by disincentivizing the class attorneys in their efforts to assure [classwide] compensation of victims of the defendant's unlawful behavior." Redish, *supra*, at 666. Given that "[t]he class benefit conferred by *cy pres* payments is indirect and attenuated," it is "inappropriate to value *cy pres* on a dollar-for-dollar basis." *In re Heartland Payment Sys., Inc.,* MDL No. 09-2046, 2012 U.S. Dist. LEXIS 37326, at *105-06 (S.D. Tex. Mar. 20, 2012); *cf. also ALI Principles* §3.13 *comment a*; *Baby Products*, 708 F.3d at 179. To do so correctly reflects that "Class members are not indifferent to whether funds are distributed to them or to *cy pres* recipients, and class counsel should not be either." *Baby Products,* 708 F.3d at 174.

Secondly, augmenting pre-existing claims does not constitute a legal windfall. Windfall compensation should be determined by comparing the relief obtained to the full measure of legal damages sought in the complaint, not to the agreed-upon payment ceiling of the settlement agreement. *See Klier*, 658 F.3d at 480 ("The fact that the members of Subclass A have received payment authorized by the settlement agreement does not mean that they have been fully compensated."); *cf. also Bluetooth*, 654 F.3d at 945 n.8 (examining whether relief obtained in settlement matched theory of the complaint); *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978) (no windfall or unjust enrichment to redistribute to class members when alleged damages are greater than the sum after redistribution). In the plaintiffs' operative Fourth Amended Complaint, their theory of damages included statutory, general, special and exemplary or punitive damages, and compiled interest, each in addition to the restitution of ill-gotten gains. ER246. Yet, the settlement payments to class members contemplate only refunds—and even that is short of restitution, with no compensation for the time-value of money or interest expenses class members may have accrued on the improper credit-card charges. As a matter of law, it is not a windfall if a defendant settles claims with class members for damages that the class representatives have alleged on their behalf for more than zero cents on the dollar. Any notion that class members walking away with more than $0 is a windfall is wholly ironic. As *Inkjet* recognized, the real and present concern is that "class counsel [will] walk[] away from a case with a windfall, while class members walk away with nothing." 2013 WL 1986396, at *9.

A settlement **need not** obtain each measure of relief sought to be adequate. Nevertheless, a settlement is unfair if it rewards non-party organizations before fully satisfying the class' claims. Class counsel and class representatives have a fiduciary duty to absent class members, and it is betrayed when they negotiate a settlement that gratuitously favors unrelated parties before the fiduciaries when it is feasible to compensate the fiduciaries. *E.g., Redish, supra,* at 666. By adopting the presumption in favor of class distributions espoused by *ALI Principles* §3.07, this Court can help to cabin unfettered use of *cy pres* and again make class members the "foremost beneficiaries" of class settlements. *Baby Prods.*, 708 F.3d at 179.

The bare legitimacy of *cy pres* in the class-action context is controvertible with good reason. *See Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 480-82 (5th Cir. 2011) (Jones J., concurring); *In re Pet Foods Prod. Liab. Litig.*, 629 F.3d 333, 358 (3d Cir. 2010) (Weis, J., concurring and dissenting); Redish, *supra*; *In re Thornburg Mortg., Inc. Secs. Litig.*, 885 F. Supp. 2d 1097, 1105-12 (D.N.M. 2012) (collecting sources); *cf. also Baby Products*, 708 F.3d at 173 n.8 (noting dispute, and noting that the "Rules Enabling Act [28 U.S.C. §2072]… provides further support for the proposition that courts should favor class settlements that provide direct compensation to the class through individual distributions").

*Cy pres* has been given a narrow berth in the Ninth Circuit. For the foregoing three independent reasons, circuit law and sound public policy requires that this particular application be rejected, and the settlement approval reversed.

### III.   Objector Perryman has standing to appeal the settlement approval and to appeal the fee award.

Below, class counsel asserted Perryman had no standing because he had been fully compensated by the settlement; the district court correctly rejected that argument. ER14 n.6. For one thing, it is factually false: the lawsuit sought statutory, special, exemplary, and punitive damages, but the settlement paid Perryman none of those things. ER246; ER101. For another, Perryman has standing to object to an unfair *cy pres* distribution. But in the event plaintiffs seek to reraise this frivolous argument, Perryman addresses it now: he has standing to bring each of his objections on appeal.

"To have standing, an appellant must establish that she has suffered an injury, caused by the appellee, that is redressable." *Lobatz v. U.S. West Cellular of Cal., Inc.,* 222 F.3d 1142, 1146 (9th Cir. 2000) (citing *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). As a class member, Objector Perryman would benefit from a settlement that fairly apportions the $12.5 million cash settlement fund Provide was willing to provide between class members and counsel. The unfair self-dealing of class counsel prevented that. Class counsel waived all claims for punitive and exemplary damages while paying themselves nearly $9 million and allocating another $3 million to local universities including the *alma mater* of one of the lead counsel. Class counsel agreed to gerrymander and artificially limit class recovery for Perryman and countless other class members to ensure that class counsel received an excessive share of the total class benefit.

Even beyond *Lobatz*, when a class member seeks to reverse an undesired settlement approval order, there is a wide consensus that being bound by the settlement's release of claims is sufficient Article III injury. *See e.g., Devlin v. Scardelletti*, 536 U.S. 1, 6-7 (2002) (ability of objecting class member to appeal settlement approval "does not implicate the jurisdiction of the courts under Article III of the Constitution"); *id.* at 7 (an objector's "complaint clearly falls within the zone of interests of the requirement that a settlement be fair to all class members"); *Bluetooth*, 654 F.3d at 949 n.9; *Cobell v. Salazar*, 679 F.3d 909, 919 (D.C. Cir. 2012) ("Any other conclusion would prove a bitter irony for those who have lost their [chose in action]"); *Union Asset Mgmt. v. Dell, Inc.*, 669 F.3d 632, 638-39 (5th Cir. 2012) ("[a]ny class member has standing to object to a class settlement"); *United States v. Alabama*, 271 Fed. App'x. 896, 898-99 (11th Cir. 2008) (*per curiam*); *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1183 & n.1 (10th Cir. 2002) (objectors who have objected to entire settlement are entitled to raise all issues relating to settlement fairness with respect to entire class). Reversing the settlement approval would redress such injury.

Reversing the settlement approval because of the inappropriate *cy pres* would also provide benefit to Perryman because such a reversal would require a *cy pres* recipient with national, rather than local scope, and/or one that isn't a secret double-dip by plaintiffs' counsel. ER102.

Even if the Court does not reverse the settlement approval, to the extent the *cy pres* is a class benefit, reducing the attorney fee will increase the benefits to class members such as Perryman. Again, the appeal can redress such injury. The Ninth

Circuit has repeated reversed improper *cy pres* awards without questioning the standing of class members to challenge them. *Nachshin*, *supra*; *Dennis*, *supra*.

All three prongs of the Article III standing test—injury, causation, and redressability—are thus met.

In its briefing below, class counsel argued that Perryman lacks standing under *Glasser v. Volkswagen of Am.*, 645 F.3d 1084 (9th Cir. 2011). This is wrong, even frivolous. Perryman is challenging the settlement approval itself (and the fee award as part of the settlement) under a common fund theory. This immediately creates two critical distinctions with *Glasser*.

*First*, as *Glasser* itself noted, *Glasser* does not apply: the appellant in *Glasser* had "expressly disclaimed recovery under a constructive common fund theory," so the independent challenge to the fees had no benefit to the class. 645 F.3d at 1089. Here, by contrast, Perryman is, and has been, propounding exactly this theory of harm to the class from structural self-dealing. *Glasser* correctly notes that class members have standing where "class counsel might obtain an excessive attorney fee award as part of a deal to accept an inadequate settlement for the class." 645 F.3d at 1088 (quoting *Lobatz*, 222 F.3d at 1147 (9th Cir. 2000), and citing several other cases).

*Second*, the appellant in *Glasser* appealed merely the fee award, not the order of final approval. 645 F.3d at 1087 (appellant voluntarily dismissed appeal of final approval of settlement); *see also Knisley v. Network Assocs.*, 312 F.3d 1123, 1125, 1127 (9th Cir. 2002) (appellant lacks standing because no longer challenging approval of settlement). Perryman, by contrast, challenges not just the fee order, but the overall

fairness of the settlement. Perryman is not objecting that Provide is settling the claims in this case for a $12.5 million payout—but Perryman is objecting that the settlement was structured so that class counsel walk away with the vast majority of that fund while leaving so many class members without full compensation or an opportunity to benefit from a reduction of the excessive fee request. In such a situation, there is no question of the standing to challenge the final approval order together with the fee order; the disproportionate fees come at the expense of what could have been negotiated on behalf of the class, and thus implicate the fairness of the settlement. *See Glasser*, 645 F.3d at 1088; *Bluetooth*, 654 F.3d at 941-49. For example, in *Inkjet*, no one questioned the standing of appellants to successfully challenge the settlement approval on the grounds that the fee request was so high as to make the settlement unfair.

In sum, because Perryman argues against the fee award on a common fund basis and because he challenges the final approval order in addition to merely the fee award, Ninth Circuit and Supreme Court precedent unequivocally supports a finding of standing.

## Conclusion

The district court's legally and factually erroneous valuation of the coupons in this settlement resulted in a wildly disproportionate attorney-fee award several times the actual value of class members' recovery. This requires reversal of the fee award at a minimum, and remand to determine the settlement fairness with an appropriately valued settlement.

But the settlement cannot stand for a separate and independent reason. The *cy pres* provision of the settlement, by directing all of it to San Diego-area charities, including the *alma mater* of class counsel, violates multiple principles this and other Circuits have elucidated to prevent abuse.

This Court should further adopt the Fifth Circuit's and the American Law Institute's position that settlement funds belong to class members first, and *cy pres* is only a last resort to protect against other abuses. But even if this Court does not accept the bright-line "last resort" rule, reversal is required under *Baby Products* for the district court's failure to investigate the feasibility of secondary distributions to uncompensated class members.

This Court should therefore reverse the settlement approval below.

Dated:  July 12, 2013                      Respectfully submitted,

                                           */s/ Theodore H. Frank*
                                           Theodore H. Frank
                                           Adam Ezra Schulman
                                           CENTER FOR CLASS ACTION FAIRNESS
                                           1718 M Street NW, No. 236
                                           Washington, DC 20036
                                           Telephone:  (703) 203-3848
                                           Email:  tfrank@gmail.com

                                           *Attorneys for Objector-Appellant*
                                           *Brian Perryman*

**Statement of Related Cases**
**pursuant to Circuit Rule 28-2.6**

*Resnick v. Netflix*, No. 12-15705 (9th Cir.), raises closely related issues relating to a district court's refusal to apply the Class Action Fairness Act to a coupon settlement because of the availability of cash relief. Briefing concluded on November 27, 2012, and oral argument has not yet been scheduled.

Executed on July 12, 2013.

*/s/ Theodore H. Frank*

Theodore H. Frank
CENTER FOR CLASS ACTION FAIRNESS
1718 M Street NW, No. 236
Washington, DC 20036
Telephone:  (703) 203-3848
Email:  tfrank@gmail.com

*Attorneys for Objector-Appellant*
*Brian Perryman*

## Certificate of Compliance
## with Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 13,777 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Garamond font.

Executed on July 12, 2013.

/s/ Theodore H. Frank
Theodore H. Frank
CENTER FOR CLASS ACTION FAIRNESS
1718 M Street NW, No. 236
Washington, DC 20036
Telephone:  (703) 203-3848
Email:  tfrank@gmail.com

*Attorneys for Objector-Appellant
Brian Perryman*

## Proof of Service

I hereby certify that on July 12, 2013, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will provide notification of such filing to all who are ECF-registered filers. Additionally, I caused to be sent a copy of the foregoing via first-class mail to the following non-registered attorneys:

Ethan Thomas Boyer, Attorney
POST KIRBY NOONAN & SWEAT
Suite 1100
600 West Broadway
Suite 1100
San Diego, CA 92101-3355

Michael L. Kirby, Attorney
Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue
Suite 1300
San Diego, CA 92101

Elliott Louis Pell
Jay J. Rice
Nagel Rice LLP
Suite 103
103 Eisenhower Parkway
Roseland, NJ 07068

Mazin A. Sbaiti
BARON & BUDD PC
Suite 1100
3102 Oak Lawn Avenue
Dallas, TX 75219

Jacie C. Zolna
Myron M. Cherry & Associates
Suite 2300
30 N. La Salle Street
Chicago, IL 60602

Executed on July 12, 2013.

*/s/ Theodore H. Frank*
Theodore H. Frank
CENTER FOR CLASS ACTION FAIRNESS
1718 M Street NW, No. 236
Washington, DC 20036
Telephone:  (703) 203-3848
Email:  tfrank@gmail.com

*Attorney for Objector-Appellant*
*Brian E. Perryman*