No. 13-55373

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE EASYSAVER REWARDS LITIGATION

JOSUE ROMERO; GINA BAILEY; GRANT JENKINS; BRADLEY
BERENSTON; JENNIFER LAWLER; DANIEL COX; JONATHAN WALTER;
AND CHRISTOPHER DICKEY,

*Plaintiffs – Appellees,*

BRIAN PERRYMAN,

*Objector – Appellant*,

v.

PROVIDE COMMERCE, INC.; REGENT GROUP, INC. D/B/A,
ENCORE MARKETING INTERNATIONAL

*Defendants – Appellees.*

On Appeal From the United States District Court
For the Southern District of California
The Honorable Anthony J. Battaglia, United States District Judge
District Court Case No. 09-CV-02094-AJB (WVG)

## DEFENDANT-APPELLEE PROVIDE COMMERCE, INC.'S
## ANSWERING BRIEF

COOLEY LLP
MICHAEL G. RHODES (rhodesmg@cooley.com)
MICHELLE C. DOOLIN (doolinmc@cooley.com)
LEO P. NORTON (lnorton@cooley.com)
4401 Eastgate Mall
San Diego, CA  92121
(858) 550-6000 (telephone)
(858) 550-6420 (facsimile)

*Attorneys for Defendant-Appellee*
PROVIDE COMMERCE, INC.

**CORPORATE DISCLOSURE STATEMENT PURSUANT TO
FEDERAL RULES OF APPELLATE PROCEDURE, RULE 26.1**

Appellee Provide Commerce, Inc. discloses that it is a wholly owned subsidiary of Liberty Interactive Corporation, which owns 100% of its stock.

Dated:  September 11, 2013          COOLEY LLP

By:    /s/Michael G. Rhodes          
            Michael G. Rhodes

Attorneys for Appellee
PROVIDE COMMERCE, INC.

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................1

STATEMENT OF JURISDICTION.........................................................3

ISSUES PRESENTED FOR REVIEW ....................................................3

STATEMENT OF THE CASE..................................................................4

STATEMENT OF FACTS .........................................................................7

I.      The Contested Membership Programs .........................................7

II.     Plaintiffs' Claims .........................................................................8

III.    Discovery Conducted....................................................................9

IV.     Provide Commerce's Positions Below .......................................10

V.      Settlement Process......................................................................11

VI.     Settlement Terms ........................................................................12

VII.    Objection To Settlement .............................................................15

VIII.   Fairness Hearing and Final Approval Order .............................16

SUMMARY OF ARGUMENT ................................................................19

ARGUMENT .............................................................................................21

I.      Standard Of Review....................................................................21

II.     Legal Standard For Final Approval Of A Class Action Settlement ............22

III.    The Judgment Should Be Affirmed Because The District Court Comprehensively Explored All Relevant Factors And Found The Settlement To Be Fair, Reasonable, And Adequate .....................................24

        A.     The Settlement Is Not A "Coupon" Settlement. ................................24

        B.     Even If The Settlement Is Classified As A "Coupon" Settlement, The Judgment Should Be Affirmed. .............................32

               1.     Even if the $20 Credit is a coupon under CAFA, the settlement did not provide for a disproportionate fee award. ....................................33

                      a.     Thee attorneys' fee award was proportionate under the percentage of total settlement value method. ..........33

**TABLE OF CONTENTS**
(continued)

**Page**

        b.    The attorneys' fee award was proportionate under the lodestar valuation method........................................36

    2.    The district court's findings support the conclusion that the settlement was not the product of self-dealing. .................37

    3.    Even if the attorneys' fee award is overturned, the overall settlement's approval should not be overturned, and any remand should be strictly limited to the amount of the attorneys' fee award................................................40

C.    The District Court Appropriately Calculated The Settlement's Value.....................................................................................44

D.    The Cy Pres Award Meets This Circuit's Standards For Approval. ...........................................................................47

    1.    There is no impropriety because counsel does not have a "significant relationship" with the cy pres recipients and will not benefit from the distribution. .....................................49

    2.    The cy pres recipients are proper because the funds will have benefits beyond San Diego.............................................52

    3.    The cy pres distribution should not be converted to a windfall to claimants at the expense of absent class members. ...............................................................................55

CONCLUSION ......................................................................................61

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Airline Ticket Comm'n Antitrust Litig.*,
   268 F.3d 619 (7th Cir. 1980) ...............................................................53

*In re Baby Prods. Antitrust Litig.*,
   708 F.3d 163 (3d Cir. 2013) .......................................................56, 57

*Baxter v. Intelius, Inc.*,
   No. SACV 09-1031 AG (MLGx), 2010 WL 3791487 (C.D. Cal. Sept. 16,
   2010) ...............................................................................................10

*Belanger v. Madera Unified Sch. Dist.,*
   963 F.2d 248 (9th Cir. 1992) .............................................................41

*Berry v. Webloyalty.com, Inc*.,
   No. 10-CV-1358-H (CAB), 2011 WL 1375665 (S.D. Cal. Apr. 11, 2011) .......10

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
   MDL No. 1967, 2011 WL 1790603 (W.D. Mo. May 10, 2011) .......................27

*In re Bluetooth Headset Prods. Liab. Litig.*,
   No. 07-ML-1822 DSF (Ex), 2012 WL 6869641 (C.D. Cal. Jul. 31, 2012) .......38

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) .............................................36, 38, 42

*Bott v. Vistaprint USA, Inc.*,
   392 Fed App'x 327 (5th Cir. 2010) ...................................................11

*Browning v. Yahoo! Inc.*,
   No. C04-01463 HRL, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007) .........29, 30

*California v. Levi Strauss & Co*.,
   41 Cal. 3d 460 (1986) .......................................................................60

*Chakejian v. Equifax Info. Servs., LLC*,
   275 F.R.D. 201 (E.D. Pa. 2011).......................................................27

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Class Plaintiffs v. Seattle*,
    955 F.2d 1268 (9th Cir. 2012) ...........................................................23

*Cyberspace, Comm'ns, Inc. v. Engler*,
    55 F. Supp. 2d 737 (E.D. Mich. 1999) ...............................................53

*Date v. Sony Elecs., Inc.*,
    No. 07-15474, 2013 WL 3945981 (E.D. Mich. July 31, 2013)..........28

*Dennis v. Kellogg Co.*,
    687 F.3d 858 (9th Cir. 2012) ..............................................18, 24, 48

*Fernandez v. Victoria Secret Stores, LLC*,
    No. 06-cv-04149 MMM, 2008 U.S. Dist. LEXIS 123546 (C.D. Cal. July
    21, 2008) ............................................................................................34

*In re FPI/Agretech Sec. Litig.*,
    105 F.3d 469 (9th Cir. 1997) ............................................................22

*Glasser v. Volkswagen of Am., Inc.*,
    645 F.3d 1084 (9th Cir. 2011) ..........................................................24

*In re Haier Freezer Consumer Litig.*,
    No. 5:11-CV-02911-EJD, 2013 WL 2237890 (N.D. Cal. May 21, 2013).........23

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998). (*Id.*) .........................................passim

*Hillis v. Equifax Consumer Servs., Inc.*,
    No. 104-CV-3400-TCB, 2007 WL 1953464 (N.D. Ga. June 12, 2007) ...........27

*Hook v. Intelius, Inc.*,
    No. 10-CV-239 (MTT), 2011 WL 1196305 (M.D. Ga. Mar. 28, 2011) ...........10

*Houck v. Folding Carton Admin. Comm.*,
    881 F.2d 494 (7th Cir. 1989) ............................................................54

*In re HP Inkjet Printer Litig.*,
    716 F.3d 1173 (9th Cir. 2013) .....................................................passim

iv.

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Kearney v. Hyundai Motor Am.*,
 No. SACV 09-1298-JST, 2013 WL 3287996 (C.D. Cal. June 28, 2013) ..........29

*Klier v. Elf Atomchem N.A., Inc.*,
 658 F.3d 468 (5th Cir. 2011) ......................................................................57, 58

*Lane v. Facebook, Inc*.,
 696 F.3d 811 (9th Cir. 2012) ..................................................................passim

*In re Linerboard Antitrust Litig.*,
 MDL No. 1261, 2008 WL 4542669 (E.D. Pa. Oct. 3, 2008) ...........................49

*Linney v. Cellular Alaska P'ship*,
 1997 WL 450064 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th
 Cir. 1998) .......................................................................................................24

*In re Lupron Mktg. & Sales Practices Litig.*,
 677 F.3d 21 (1st Cir. 2012).......................................................................passim

*In re Mego Fin. Corp. Sec. Litig. (Dunleavy v. Nadler)*,
 213 F.3d 454 (9th Cir. 2000) ..............................................................................21

*In re Mercury Interactive Corp. Sec. Litig.*,
 618 F.3d 988 (9th Cir. 2010) .............................................................................22

*Miller v. Fairchild Indus., Inc.*,
 797 F.2d 727 (9th Cir. 1986) ............................................................................41

*Moody v. Sears Roebuck & Co.*,
 664 S.E.2d 569 (N.C. App. 2008)......................................................................46

*Morris v. Lifescan, Inc.*,
 54 Fed. App'x 663 (9th Cir. 2003) ....................................................................35

*Nachshin v. AOL, LLC*,
 663 F.3d 1034 (9th Cir. 2011) .......................................................51, 53, 54, 55

*O'Brien v. Brain Research Labs*, LLC,
 No. 12-204, 2012 WL 3242365 (D.N.J. Aug. 9, 2012)................................45, 58

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Officers for Justice v. Civil Serv. Comm'n*,
688 F.2d 615 (9th Cir. 1982) ............................................................23

*In re Pac. Enters. Sec. Litig.*,
47 F.3d 373 (9th Cir. 1995) ..............................................................35

*Perez v. Asurion Corp.*,
No. 06-20734-CIV, 2007 WL 2591180 (S.D. Fla. Aug. 8, 2007).....................29

*Perkins v. Am. Nat. Ins. Co.*,
No. 05-CV-100 (CDL), 2012 WL 2839788 (M.D. Ga. July 10, 2012)........52, 55

*Powers v. Eichen*,
229 F.3d 1249 (9th Cir. 2000) ..........................................................22

*In re Prudential Sales Practice Litig.*,
148 F.3d 283 (3d Cir. 1998) ..............................................................42

*Reibstein v. Rite Aid Corp.*,
761 F. Supp. 2d 241 (E.D. Pa. 2011)...................................29, 30, 43

*Reno v. Am. Civil Liberties Union*,
521 U.S. 844 (1997).........................................................................53

*Rodriguez v. West Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ....................................................24, 42

*Shames v. Hertz Corp.*,
No. 07-CV-2174-MMA(WMC), 2012 WL 5392159 (S.D. Cal. Nov. 5,
2012) ...................................................................................27, 28, 30

*Six Mexican Workers v. Ariz. Citrus Growers*,
904 F.2d 1301 (9th Cir. 2011) ....................................................18, 55

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ..........................................................23

*Synfuel v. DHL Express (USA)*,
463 F.3d 646 (7th Cir. 2006) ....................................................31, 32

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*True v. Am. Honda Motor Co.*,
    749 F. Supp. 2d 1052 (C.D. Cal. 2010) ............................................................46

*Union Fidelity Life Ins. Co. v. McCurdy*,
    781 So.2d 186 (Ala. 2000) ...............................................................................47

*United States v. LKAV*,
    712 F.3d 436 (9th Cir. 2013) ............................................................................26

*In re Universal Serv. Fund Telephone Billing Pracs. Litig.*,
    No. 02-MD-1468-JWL, 2013 WL 2476587 (D. Kan. June 7, 2013) .................57

*In re Vistaprint Corp. Mktg. & Sales Prac. Litig.*,
    MDL No. 4:08-md-1994, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009) .........11

*Young v. Polo Retail, LLC*,
    No. C-02-4546 VRW, 2007 U.S. Dist. LEXIS 27269 (N.D. Cal. 2007) ...........35

**STATUTES**

28 U.S.C.
    § 1711...............................................................................................................26
    § 1712......................................................................................................26, 32, 30
    § 1712(a) ....................................................................................................passim
    § 1712(b)...................................................................................................31, 36
    § 1712(b)(1)..............................................................................................25, 36
    § 1712(b)(2)......................................................................................................26
    § 1712(c) ..........................................................................................................30
    § 1712(e) ..............................................................................................25, 32, 61

Class Action Fairness Act ..................................................................................passim

**OTHER AUTHORITIES**

Fed. R. Civ. P.
    § 23(e) ................................................................................................3, 25, 41
    § 23(e)(1) ..........................................................................................................22
    § 23(e)(2) ....................................................................................................32, 22

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

James D. Cox & Randall S. Thomas, *Letting Billions Slip Through Your
    Fingers: Empirical Evidence and Legal Implications of the Failure of
    Financial Institutions to Participate in Securities Class Action
    Settlements,*
    58 Stan. L. Rev. 411, 412 (2005)..........................................................................59

S. Rep. No. 109-14 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3 ........................27, 30

Samuel Issacharoff & Geoffrey P. Miller, *Will Aggregate Litigation Come to
    Europe?*, 62 Vand. L. Rev. 179, 205 (2009) ......................................................59

## PRELIMINARY STATEMENT

After over two-and-a-half years of hard fought, expensive putative class action litigation arising from plaintiffs' online enrollment in certain subscription-based membership programs, plaintiffs and defendants Provide Commerce, Inc. ("Provide Commerce") and Regent Group, Inc. d/b/a Encore Marketing International ("EMI") reached a heavily negotiated, arms' length, and non-collusive mediated settlement on a classwide basis. The parties did so (i) after numerous settlement conferences with the magistrate judge assigned to the case and two private mediations before two different respected former federal magistrate judge mediators, (ii) with the benefit of extensive discovery, including hundreds of thousands of pages of documents, third-party discovery, and numerous party depositions, and (iii) while Provide Commerce and EMI's motions to dismiss—based on several federal district court opinions and one appellate circuit court opinion that rejected complaints involving substantially similar enrollment processes and disclosures for other subscription-based membership programs—were pending.

Despite the weakness of plaintiffs' case, the settlement is substantial. It provides the class with two benefit components: (1) a $12.5 million cash fund from which class members had the opportunity to make a claim for a cash payment up to

the full amount he or she paid for monthly membership fees, less any full or partial payment for such monthly fees previously received; and (2) a transferable $20 Credit[1] that can be used on a future purchase from certain Provide Commerce websites, which will be provided as a direct benefit to all class members without requiring submission of a claim form. The parties agreed that any unclaimed portions of the cash fund *would not* revert to defendants, but rather would be used to fund educational programs regarding internet privacy or internet data security at three nationally reputed universities.

After direct notice to approximately 1.3 million class members, only one class member filed a valid objection—Appellant Bryan Perryman ("Objector"), who also made a claim from the cash fund and will receive a cash payment equal to the full amount of the monthly membership fees he paid. Objector does not take issue with the class benefits or the class notice program under the settlement. He only takes issue with the attorneys' fees requested and the *cy pres* recipients. The district court carefully considered and rejected his objection, and issued a thoughtful 22-page order granting final approval.

Objector raises many of the same arguments here that the district court rejected below. The settlement is fair, reasonable, and adequate, and complies

---

[1] "$20 Credit" is a defined term under the settlement agreement at Section 1.1. (ER 150.)

with Rule 23(e) of the Federal Rules of Civil Procedure ("Rule 23") and any applicable requirements of the Class Action Fairness Act ("CAFA"). As such, the judgment should be affirmed.

## STATEMENT OF JURISDICTION

Provide Commerce does not contest the Statement of Subject Matter and Appellate Jurisdiction in Objector's Opening Brief (OOB), pp. 1-2.

## ISSUES PRESENTED FOR REVIEW

A.    Whether the settlement constitutes a "coupon" settlement under CAFA, as Objector contends.

B.    If the approved settlement is indeed a "coupon" settlement under CAFA, whether it meets CAFA's requirements.

(1)    Whether the attorneys' fee award was the product of self dealing.

(2)    Whether the settlement provides for a disproportionate attorneys' fee award as compared to the cash component and $20 Credit components.

(3)    Whether the factual findings and the record support the district court's conclusion that the settlement is fair, reasonable, and adequate, and lacked collusion.

C.    Whether the district court appropriately valued the settlement for purposes of determining it was fair, reasonable, and adequate.

D.    Whether the *cy pres* recipients satisfy the Ninth Circuit standards for approval.

(1)    Whether certain counsel's alumni status for one of the three *cy pres* recipients created an unacceptable impropriety.

(2)    Whether the *cy pres* recipients will have a national impact, particularly where the underlying case and *cy pres* awards relate to internet privacy or internet data security.

(3)    Whether the *cy pres* funds should instead revert to only those class members that submitted claims.

## STATEMENT OF THE CASE

This appeal arises from a single objection to an approved classwide settlement affecting approximately 1.3 million class members. Provide Commerce is an online retailer headquartered in San Diego, California that owns and operates, among other websites, ProFlowers.com, RedEnvelope.com, Berries.com, and CherryMoonFarms.com. Pursuant to a confidential marketing agreement between EMI and Provide Commerce, EMI offered and administered subscription-based membership programs to customers of Provide Commerce. The benefits of such

4.

programs included a $15 gift code off of a future Provide Commerce website order, up to 20% cash back on gift card purchases for certain retailers, and additional benefits, such as travel savings and upgrades, concierge service, and entertainment deals and packages.  Plaintiffs contended that the enrollment process for the membership programs was misleading, resulting in plaintiffs and the class (i) unintentionally signing up for the membership programs and (ii) being damaged as a result of Provide Commerce transmitting payment and billing information to EMI upon EMI's request after enrollment and then EMI charging their debit and credit cards for activation and monthly membership fees.  (*See generally* ER 204-10, 215-16.)

Beginning in August 2009, various putative class action complaints against Provide Commerce and EMI were filed and ultimately consolidated.  (ER 258, Dkt. No. 27.)  The parties aggressively litigated the pleadings and engaged in extensive discovery.  After multiple settlement conferences and mediations with the magistrate judge for the case and two different respected private mediators over a period of more than 16 months, the parties reached a settlement.  The settlement established a non-reversionary cash fund of $12.5 million.  The settlement also provided that a face value of $26 million in credits usable on certain Provide

Commerce websites would be distributed all class members without any claims process. (ER 11-13.)

Plaintiffs filed an unopposed motion for preliminary approval on June 13, 2012. (ER 276, Dkt. No. 248; SER 241-273.) The district court granted preliminary approval on June 26, 2012, and notice was provided to the class. (ER 276, Dkt. No. 252; SER 236-240.) Plaintiffs filed a motion for attorneys' fees, costs, and named plaintiffs' enhancement awards on November 26, 2012. (ER 277, Dkt. No. 255; SER 103-130.) Objector filed the lone objection to the settlement on December 7, 2012.[2] (ER 277, Dkt. No. 258.) Plaintiffs filed a motion for final approval on January 18, 2013. (ER 277, Dkt. No. 262; SER 70-102; SER 1-34.) The district court conducted a fairness hearing on January 28, 2013. (ER 278, Dkt. No. 270.) The district court entered its order granting final approval, granting plaintiffs' motion for attorneys' fees, costs, and enhancement awards, and overruling Objector's objection on February 4, 2013. (ER 9-30.) The district court entered judgment on February 21, 2013. (ER 3-8.) Objector timely filed his notice of appeal on March 4, 2013. (ER 279, Dkt. No. 278.)

---

[2] An invalid letter purporting to be an objection to the settlement was submitted to plaintiffs' counsel but was not filed with the district court as required. (*See* ER 14; SER 88.)

## STATEMENT OF FACTS

### I.  THE CONTESTED MEMBERSHIP PROGRAMS

The underlying litigation is an alleged imperfect disclosure case arising from plaintiffs' online enrollment in subscription-based membership programs known as EasySaver Rewards, RedEnvelope Rewards, and Preferred Buyers Pass (collectively the "Membership Programs"), each of which was offered and administered by EMI.  Plaintiffs claim that, after they ordered items from certain of Provide Commerce's websites, they were presented with an offer to enroll in one of the Membership Programs.  (*See* ER 202 at ¶ 1; ER 213-14 at ¶¶ 39, 41-43; SER 252.)  As part of the offer to enroll, plaintiffs allege they were presented with the opportunity to claim a gift code for $15 off his or her next order.  (SER 252; ER 10.)

Plaintiffs concede that they navigated to the Membership Programs' enrollment webpages ("EMI Enrollment Pages"), entered their email addresses and zip codes, and clicked the acceptance button.  When they did so, plaintiffs alleged that Provide Commerce transmitted their payment and billing information to EMI, who proceeded to enroll plaintiffs and class members in one of the Membership Programs and charged their credit or debit cards a $1.95 activation fee, followed by a monthly fee of $14.95.  Plaintiffs contend they did not intend to enroll in the Membership Programs, but rather were seeking to claim the gift code for $15 off,

which they believed to be without any obligation despite the disclosures contained on the EMI Enrollment Pages.  (SER 252; ER 208-209 at ¶¶ 26, 28; ER 211 at ¶ 32; ER 213-14 at ¶¶ 39-43; ER 218-19 at ¶¶ 56(b), 57(b), 58(b).)

Because they purportedly did not intend to enroll in the Membership Programs, plaintiffs contend that the charges that EMI posted to their credit or debit cards for the Membership Programs' fees were unauthorized.  (ER 208-09 at ¶ 28; ER 211 at ¶ 32; ER 213-14 at ¶¶ 40-43.)  Plaintiffs also allege that they did not receive the promised $15 off gift code.  (*Id.*)

## II.    PLAINTIFFS' CLAIMS

Based on the conduct surrounding their enrollment in the Membership Programs, plaintiffs asserted ten claims against Provide Commerce and EMI: (1) breach of contract (against Provide Commerce only); (2) breach of contract (against EMI only); (3) breach of implied covenant of good faith and fair dealing; (4) fraud; (5) violations of the California Consumers Legal Remedies Act; (6) unjust enrichment; (7) violation of the Electronic Funds Transfer Act (against EMI only); (8) invasion of privacy; (9) negligence; and (10) violations of the

Unfair Competition Law.   (ER 221-246.[3])   Plaintiffs asserted these claims individually and on behalf of a putative nationwide class.   (ER 202 at ¶ 1; ER 217-21 at ¶ 56-65.)   Plaintiffs sought damages, attorneys' fees, and costs.   (ER 246-47 at Prayer for Relief.)

## III.   DISCOVERY CONDUCTED

In two and a half years of litigation, the parties engaged in extensive discovery, had completed pre-class certification fact discovery and had nearly completed pre-class certification expert discovery when they settled.   During discovery, Provide Commerce produced more than 450,000 pages of documents, responded to twelve interrogatories, defended six corporate depositions, took six current and former plaintiffs' depositions, obtained over 500 pages of documents from plaintiffs, and received over 28,500 pages of documents from plaintiffs that they obtained through third party discovery.[4]   (SER 35-36 at ¶ 2.)   Provide Commerce and plaintiffs also served opening expert reports.   (*Id.*)

---

[3] The operative complaint is the Fourth Amended Consolidated Complaint, filed on December 14, 2011.  (ER 274, Dkt. No. 221.)  Defendants had respectively moved to dismiss the complaint on various grounds at the time of the settlement, and their motions were subsequently denied as moot in light of the settlement.  (ER 275, Dkt. Nos. 227 & 228; ER 276, Dkt. No. 251.)

[4] Plaintiffs issued at least 22 nonparty subpoenas to credit card companies and companies that fulfilled certain membership benefits.  (SER 113.)

## IV.    PROVIDE COMMERCE'S POSITIONS BELOW

Provide Commerce maintained that the enrollment process for the membership programs was not deceptive as matter of law, that plaintiffs received their $15 off gift code upon enrollment, and that plaintiffs' claims were without merit.  (SER 10.)  Provide Commerce contended: (i) the terms of the offer and plaintiffs' enrollment in the Membership Programs were adequately disclosed and (ii) plaintiffs entered into valid electronic contracts with EMI for the Membership Programs that authorized Provide Commerce to disclose billing and payment information to EMI upon EMI's request.  (*Id.*)

Provide Commerce also contended it should prevail on its motion to dismiss pending at the time of the settlement (or later in the case at summary judgment) because several federal district courts had recently rejected complaints involving substantially similar enrollment processes and disclosures for other subscription-based membership programs.  *See, e.g., Baxter v. Intelius, Inc.*, No. SACV 09-1031 AG (MLGx), 2010 WL 3791487, at *3-5 (C.D. Cal. Sept. 16, 2010) (holding that similar enrollment webpage was not deceptive as a matter of law); *Hook v. Intelius, Inc.*, No. 10-CV-239 (MTT), 2011 WL 1196305, at *9-10 (M.D. Ga. Mar. 28, 2011) (same); *Berry v. Webloyalty.com, Inc.*, No. 10-CV-1358-H (CAB), 2011 WL 1375665, at *4-6 (S.D. Cal. Apr. 11, 2011) (same), *vacated on*

*other grounds*, 517 Fed App'x 581 (9th Cir. 2013). (SER 10, 18-19.) One such district court opinion had been affirmed on appeal. *In re Vistaprint Corp. Mktg. & Sales Prac. Litig.,* MDL No. 4:08-md-1994, 2009 WL 2884727, at *8 (S.D. Tex. Aug. 31, 2009) (granting defendants' motion to dismiss and holding nearly identical enrollment webpage was not deceptive as a matter of law), *aff'd*, *Bott v. Vistaprint USA, Inc.*, 392 Fed App'x 327 (5th Cir. 2010).

As such, Provide Commerce maintained that it would not be found liable in this action. It further maintained that it had strong arguments to defeat class certification. Nonetheless, Provide Commerce recognized that all litigation presents risks and is costly. Accordingly, Provide Commerce participated with the other parties in multiple arm's-length settlement and mediation sessions.

## V. SETTLEMENT PROCESS

During the course of litigation, the parties participated in numerous settlement conferences and mediations in an effort to resolve this case. On December 15, 2010, the parties appeared before Magistrate Judge William Gallo for an Early Neutral Evaluation conference. (ER 264, Dkt. Nos. 89, 90.) On May 18, 2011, the parties participated in a full-day private mediation session before Judge Leo S. Papas (Ret.). (SER 36 at ¶ 3.) On May 20, 2011, the parties again appeared before Magistrate Judge Gallo and participated in a Mandatory

Settlement Conference with defendants and their respective insurance carriers. (ER 265, Dkt. Nos. 102 & 107; ER 266, Dkt. No. 109.)  Magistrate Judge Gallo conducted follow up telephone conferences with certain defendants and insurers on July 18, 2011, August 5, 2011, and August 17, 2011.  (ER 267, Dkt. No. 131; ER 269, Dkt. Nos. 157, 158; ER 270, Dkt. Nos. 168, 170.)  Magistrate Judge Gallo conducted an in-person Mandatory Settlement Conference with plaintiffs only on October 7, 2011.  (ER 271, Dkt. No. 181; ER 272, Dkt. No. 198.)

The parties continued to discuss a potential settlement over the next several months and ultimately agreed to attend a second private mediation with another mediator.  (SER 36 at ¶ 3.)  On April 9, 2012, the parties participated in a full-day private mediation session with Judge Edward Infante (Ret.).  (*Id*.)  At the conclusion of the mediation, the parties reached an agreement on the high-level terms of a settlement, conditioned on the parties negotiating and executing a complete written agreement.  (*Id*.)  In the weeks following the mediation, the parties negotiated a formal written settlement agreement.  (*Id*.; *see* ER 148-174.)

## VI.  SETTLEMENT TERMS

The parties structured the settlement to specifically address plaintiffs' core allegations.  First, because plaintiffs contended that they and the class had been damaged by Provide Commerce's purported unauthorized or otherwise improper

disclosure of their billing and payment information to EMI and EMI's posting of allegedly unauthorized charges to their credit or debit card accounts for membership fees, Provide Commerce and EMI agreed to establish a $12.5 million non-reversionary cash fund to, among other things, make cash payments to authorized claimants up to the full amount of monthly membership fees paid (less any prior full or partial payment from Provide Commerce or EMI for such fees). (ER 59-60, 44.[5]) Second, because plaintiffs contended that they and the class were mislead by the offering of a $15-off code as part of the enrollment process and that they did not actually receive the code upon enrollment, Provide Commerce agreed to provide each class member with a $20 Credit. (ER 61.[6]) Class members were not required to submit a claim form to obtain the $20 Credit. (*Id.*)

Notably, the settlement did not include injunctive relief because the contested practices had stopped at the time of the settlement. (ER 63.) At the fairness hearing, Provide Commerce's counsel stated that plaintiffs deserved at least some credit for the fact that the challenged practices had stopped. (*Id.*)

The main terms of the settlement are:

---

[5] Approximately 3,000 claims were submitted. Each of those claims will be paid in full, equaling approximately $225,000. Objector submitted a claim, and will receive $122. (ER 86.)

[6] As there are about 1.3 million class members, the face value of the $20 merchandise credits is approximately $26 million. (ER 49.)

- Establishment of a class defined as:  "[A]ll persons who, between August 19, 2005 and [June 26, 2012], placed an order with a website operated by Provide Commerce, Inc. and were subsequently enrolled by Regent Group Inc. dba Encore Marketing International, Inc. in one or more of the following membership programs: EasySaver Rewards, Red Envelope Rewards, or Preferred Buyers Pass."  (ER 151 at ¶ 1.7.)

- Notice to settlement class members by e-mail, followed by U.S. postal mail for undeliverable e-mails, and an Internet website.  (ER 156-57 at ¶ 3.3.)

- Creation of a cash fund of $12.5 million, to be used to pay the claims of settlement class members, cost of providing notice, claims administration fees and costs, court-approved attorneys' fee and cost award, and court-approved plaintiffs' enhancement awards.  Any left-over funds would be paid on an equal basis to San Diego State University, University of California at San Diego, and University of San Diego School of Law, with the payments specified to be used for a chair, professorship, fellowship, lectureship, seminar series or similar funding, gift, or donation program regarding internet privacy or internet data security. (ER 152 at ¶ 2.1.)  Note that after full payment of the class members'

claims, disbursement of attorneys' fees, costs, and plaintiffs' enhancement awards, and claims administration fees and costs, each university will receive nearly $1 million.  (ER 82.)

- To class members who timely submit valid claim forms, a cash payment from the cash fund for the amount of monthly fees he or she paid for Membership Program(s) less any full or partial payment for such fees previously received.  (ER 154 at ¶ 2.1 (d).)

- To all class members (whether or not they submit claim forms), a $20 Credit useable at certain Provide Commerce websites.  (ER 155 at ¶ 2.2.)

- Awards to the named plaintiffs ranging from $5,000 to $15,000 (depending on the depth of their involvement in the case), subject to court approval.  (ER 153 at ¶ 2.1(b).)

- Attorneys' fees and costs of up to a maximum amount of $8.65 million in fees and $200,000 in costs, subject to court approval.  (ER 153 at ¶ 2.1(c).)

## VII.  OBJECTION TO SETTLEMENT

Objector filed the lone objection to the settlement challenging the amount of the attorneys' fees requested (based on his contention that the settlement was a "coupon" settlement necessitating heightened scrutiny), as well as the *cy pres*

recipients.  (ER 120-129.)  Ignoring applicable case law, Objector argued that the $20 Credit was a "coupon" that was not worth its face value.  (ER 123.)

Objector did not challenge the overall settlement or its benefits, stating: "The argument here is not that the total fund should be of greater magnitude; rather the argument is that the parties are overstating the size of the total fund, and that a larger share of the settlement should have gone to the class, as opposed to the lawyers who are charged to represent them."  (ER 138.)

As a class member, Objector filed a claim for a cash payment for the full amount of monthly fees he was charged for the Membership Programs, which is $122.  (ER 86.)  He will also receive the $20 Credit.

## VIII.  FAIRNESS HEARING AND FINAL APPROVAL ORDER

The district court conducted a fairness hearing on January 28, 2013. Counsel for all parties appeared; Objector was not present, but was represented by counsel.  (ER 41.)  After entertaining argument for over 70 minutes, the district court took the matter under submission.  (ER 90.)  On February 4, 2013, the district court issued a final order approving the settlement, granting plaintiffs' motion for attorneys' fees and costs and named plaintiffs' enhancement awards, and overruling Objector's objection.  (ER 9 *et seq.*)  In a thoughtful and reasoned 22-page order, the court considered the proposed settlement, weighed the merits of the

objection, and ultimately determined that the parties had entered into the settlement in good faith, after extensive arm's-length negotiations. (ER 28.) The district court concluded that the settlement was fair, reasonable, and adequate and in the best interests of class members. (ER 27.)

Addressing Objector's issues regarding the $20 Credit component, the district court noted that, "[w]hile Perryman objects to the alleged 'coupon' offered in the settlement, he largely ignores the fact that there is also a cash fund that provides [payment] to class members." (ER 15.) The district court concluded that the settlement was distinguishable from a pure "coupon" settlement because it included an accompanying $12.5 million cash fund. (ER 16.) Further, the court found that the $20 Credit—whether or not it was a "coupon"—provided class members with an actual value of $20 because the $20 Credit is fully transferrable and may be used to purchase items without requiring the class members to spend additional money for the purchase. (ER 17.) The district court also noted that the settlement was non-reversionary. (ER 24.) Accordingly, the district court valued the settlement at $38 million ($12.5 million in cash plus approximately $26 million for the $20 Credit component). (ER 29.)

Addressing Objector's issues with the *cy pres* recipients, the district court noted that *cy pres* distributions in connection with class settlements are acceptable

if they qualify as "the next best distribution" to giving the funds directly to the class members.  (ER 18 (citing *Dennis v. Kellogg Co.*, 687 F.3d 858, 865 (9th Cir. 2012) and *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 2011)).)  The district court found that the proposed *cy pres* distribution was "directly tied to the statutes underlying Plaintiffs' claims" because the funds would "directly contribute to the national academic dialogue involving internet privacy and security," and because the funds would benefit absent class members, all of whom are internet consumers: "Regardless of their physical locations, programs furthering the goals of internet security and privacy will benefit users of the internet everywhere."  (ER 21.)  The district court rejected the Objector's argument that University of San Diego Law School was an unacceptable *cy pres* beneficiary because a couple of the numerous attorneys that had appeared in the case happened to be alumni of that institution.  (ER 20.)  In doing so, the court noted that, of the three institutions sharing the *cy pres* award, University of San Diego Law School was not entitled to a greater award than the others.  (*Id.*)  The court further noted that, "simply by virtue of it being a law school, USD Law School may be in the best position to develop and research the legal issues associated with internet privacy and security underlying Plaintiffs' claims."  (*Id.*)

Regarding attorneys' fees, the district court concluded that the attorneys' fee award was justified under both the common fund and lodestar valuation methods. (ER 29.)  Under the common fund method, the court found that the $8.65 million attorneys' fee award constituted 22.7% of the total settlement value, placing it within the acceptable 25% benchmark under *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).  (*Id.*)  The court also found that the fees were appropriate under the lodestar method because class counsel's hours and expenses were reasonable,[7] and a multiplier of 2.1 was reasonable and appropriate considering the results achieved and the risks undertaken by class counsel.  (*Id.*)

## SUMMARY OF ARGUMENT

Objector misconstrues the settlement and fails to show any abuse of discretion warranting reversal.

A.    The settlement is not a "coupon" settlement.  The settlement established a cash fund from which eligible class members could make a claim for a cash payment up to the full amount of monthly fees the class member paid less any prior payments received for such fees.  *Additionally*, the settlement provided a $20 Credit to all class members without having to make a claim.  When redeemed, the $20 Credit is akin to cash on Provide Commerce's websites, which offer

---

[7] Class counsel consisted of five different plaintiffs' law firms, which documented 7,700 hours spent on the case at an estimated value of $4.3 million.  Class counsel also advanced costs totaling nearly $224,000.  (SER 215-216 at ¶ 8.)

products *priced below* $20 (excluding service charges and taxes). Objector ignores the existence of the cash fund and distorts the record and the law to support his contention that this is a "coupon" settlement requiring heightened scrutiny under CAFA.

B.     Even if the settlement is considered a "coupon" settlement, it withstands any additional requirements under CAFA.

(1)     The settlement does not provide for a disproportionate attorneys' fee award.

(2)     There are more than sufficient factual findings in the record to support the district court's conclusion that the settlement is fair, reasonable, and adequate and lacked collusion.

(3)     Objector did not properly raise on appeal an argument that remand is necessary to allow the district court to reconsider the overall settlement's fairness using a different estimate of the settlement's value.

C.     Regardless of whether the approved settlement is a "coupon" settlement, the district court's valuation was consistent with applicable law and does not in any way undermine settlement approval.

D.    The *cy pres* recipients meet this Court's standards for approval because the proposed distribution represents a fair and reasonable effort to address the class's claims and to indirectly benefit the silent class members.

(1)    There is no impropriety because a couple of the numerous attorneys that appeared in this case happened to graduate from University of San Diego School of Law, one of three different *cy pres* recipients equally sharing in any remainder.

(2)    Although the three *cy pres* recipients are located in the greater San Diego metropolitan area, they are positioned to impact the national discourse regarding internet privacy and data security, as they do not claim to be serving solely the academic interests of San Diegans, but those that persist on a national level.

(3)    The *cy pres* distribution should not be converted to a windfall for class members by distributing the *cy pres* funds to only those class members that submitted claims.

## ARGUMENT

### I.    STANDARD OF REVIEW

The district court's decision to approve or reject a proposed settlement in a class action is reviewed for an abuse of discretion, and such review is extremely limited.  *See In re Mego Fin. Corp. Sec. Litig. (Dunleavy v. Nadler)*, 213 F.3d 454,

458 (9th Cir. 2000). An award of attorneys' fees in a class action and the choice of method for determining fees are also reviewed for an abuse of discretion. *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010); *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000) (explaining that the district court has broad authority over awards of attorneys' fees in class actions); *In re FPI/Agretech Sec. Litig.*, 105 F.3d 469, 472 (9th Cir. 1997) ("In class actions, the district court has broad authority over awards of attorneys' fees; therefore, our review is for an abuse of discretion.").

## II. LEGAL STANDARD FOR FINAL APPROVAL OF A CLASS ACTION SETTLEMENT

When a district court conducts a fairness hearing, there are two questions presented. First, district courts address whether the settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2). Second, district courts address whether the notice to the class was appropriate. *See* Fed. R. Civ. P. 23(e)(1); *Hanlon*, 150 F.3d at 1025.

Objector did not challenge the adequacy of notice or the class benefits of the settlement below. Indeed, he conceded that his objection was not "that the settling parties have colluded" or that "the total value of the settlement package is too small relative to the value of the litigation." (ER 116.) Instead, he argued that

class counsel "seized a disproportionate share of the recovery" and that the "*cy pres* is used impermissibly." (*Id.*; *see also* ER 129-134; ER 138-139.)

There are several factors to consider when determining whether a settlement is fair, reasonable, and adequate: (1) "the strength of plaintiffs' case;" (2) "the risk, expense, complexity, and likely duration of further litigation;" (3) "the risk of maintaining class action status throughout the trial;" (4) "the amount offered in settlement;" (5) "the extent of discovery completed, and the stage of the proceedings;" (6) "the experience and views of counsel;" (7) "the presence of a governmental participant;" and (8) "the reaction of the class members to the proposed settlement." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1026). This list is not exclusive and different factors may be entitled to different weight in different contexts. *Officers for Justice*, 688 F.2d at 625.

Public policy strongly favors the settlement of complex class actions. *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 2012). Although the proponents have the burden to prove the fairness of a settlement, *In re Haier Freezer Consumer Litig.*, No. 5:11-CV-02911-EJD, 2013 WL 2237890, at *5 (N.D. Cal. May 21, 2013) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003)), the

fact that a settlement "was reached in arm's length negotiations, after relevant discovery had taken place create[s] a presumption that the agreement is fair." *Linney v. Cellular Alaska P'ship*, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998); *see also Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (explaining that the Ninth Circuit "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution").

If, after the fairness hearing, the settlement is determined to be fair, reasonable, and adequate, the district court then issues a final order approving the settlement and, ultimately, a judgment. *See Glasser v. Volkswagen of Am., Inc.*, 645 F.3d 1084, 1087 (9th Cir. 2011). "To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Dennis*, 697 F.3d at 864 (internal quotation marks and citations omitted).

## III. THE JUDGMENT SHOULD BE AFFIRMED BECAUSE THE DISTRICT COURT COMPREHENSIVELY EXPLORED ALL RELEVANT FACTORS AND FOUND THE SETTLEMENT TO BE FAIR, REASONABLE, AND ADEQUATE

### A. The Settlement Is Not A "Coupon" Settlement.

Objector bases his appeal of the attorneys' fee award almost entirely on the premise that the settlement is a "coupon" settlement because of the $20 Credit

component.  Objector's premise is false, and therefore, his contention as to the attorneys' fee award should be rejected.

CAFA provides that the district court may approve a class settlement contemplating an award of "coupons" to class members "only after a hearing to determine whether, *and making a written finding that*, the settlement is fair, reasonable and adequate for class members."  28 U.S.C. § 1712(e) (emphasis added).  *Compare* Fed. R. Civ. P. 23(e) (requiring a hearing to determine whether settlement is fair, reasonable, and adequate for class members, but not requiring a written finding to that effect).

CAFA also provides detailed instructions for calculating an attorneys' fee award in a "coupon" settlement.  Specifically, "[i]f a proposed settlement in a class action provides for recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed."  28 U.S.C. § 1712(a).  "If a proposed settlement in a class action provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action."  *Id*. § 1712(b)(1).  Should the

attorney's fees be calculated under this subsection, the district court is expressly permitted to apply the lodestar method, with a multiplier, to determine the fee award. *Id*. § 1712(b)(2). (For further discussion, *see infra*, at Section III.B.)

Objector contends that these CAFA provisions apply to this settlement. According to Objector, the $20 Credit awarded to all class members without having to make a claim is a "coupon" because it entitles class members to "a $20 discount on merchandise." (OOB 22.) Objector's contention that the $20 Credit is a "coupon" rendering the entire settlement a "coupon" settlement is wrong. Objector ignores the record evidence and applicable law.

CAFA does not expressly define the term "coupon." *See* 28 U.S.C. § 1711. In construing a statute, a court first looks to the statute's words, giving undefined terms their usual and ordinary meaning. *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013). The statute's words must be construed in context. *Id.* The statute's plain meaning controls unless the statute's words are ambiguous. If the statute's language is susceptible to more than one interpretation, the court may use extrinsic aids, such as a statute's legislative history. *Id.* Here, the use of the word "coupon" is ambiguous, justifying analysis of the statute's legislative history.

The legislative history of CAFA demonstrates that Congress passed Section 1712 to address situations where the class was provided "essentially valueless

coupons, while the class counsel receive[d] substantial attorneys' fees."  S. Rep. No. 109-14, at 30 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 30.  In particular, Congress placed blame on "many so-called 'coupon settlements' in which class members receive nothing more than promotional coupons to purchase more products from the defendants."  *Id.* at 15.  Indeed, typical "coupon settlements" offer only "*discounts* on products where class members are required to purchase the products and pay the difference between the full and coupon-discounted price." (ER 16 (citing *Shames v. Hertz Corp.*, No. 07-CV-2174-MMA(WMC), 2012 WL 5392159, at *16 (S.D. Cal. Nov. 5, 2012) (emphasis in original)); *see Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201, 206-07, 215 n.17 (E.D. Pa. 2011); *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, MDL No. 1967, 2011 WL 1790603, at *3 (W.D. Mo. May 10, 2011); *Hillis v. Equifax Consumer Servs., Inc.*, No. 104-CV-3400-TCB, 2007 WL 1953464, at *4, 11 (N.D. Ga. June 12, 2007).  Importantly, Congress expressly stated that by passing CAFA, it did "not intend to forbid all non-cash settlements."  S. Rep. No. 109-14, at 31; *see also In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 n.4 (9th Cir. 2013) (acknowledging that "in-kind settlements" may be appropriate in certain situations, such as when the retailer has repeat customers).

*HP Inkjet* is instructive because it highlights the significant differences between a "coupon" and the $20 Credit provided in addition to cash payments here. That case involved a classic coupon settlement that provided class members with non-transferable e-credits worth $2 to $6. The credits could be used only at HP.com, where prices were higher than other retailers selling the exact same items. 716 F.3d at 1179 n.6 ("Objectors presented evidence that the same HP 'Combo Pack Ink Cartridge' sells for $42.99 on HP.com, while selling for $36.99 on Amazon.com."). In addition, the items for sale on HP.com cost far more than $6. *Id.* Therefore, the class members in *HP Inkjet* were *only* receiving a *small discount* on new purchases, rather than being able to obtain merchandise for *free*.

On the other end of the spectrum, several courts have found that credits, vouchers, or gift cards that can be used to obtain *free* merchandise, like the secondary benefit provided to class members in the settlement here, are not "coupons." *See, e.g.*, *Shames*, 2012 WL 5392159, at *16 (distinguishing between settlements that offer "cash [or] vouchers for free products" as opposed to "*discounts* on products where class members are required to purchase the products and pay the difference between the full and coupon-discounted price"); *Date v. Sony Elecs., Inc.*, No. 07-15474, 2013 WL 3945981, at *8 (E.D. Mich. July 31, 2013) (holding that a $60 gift card was not a coupon because it "can be used to

fund the entire purchase of small items or can be applied to the purchase of a more valuable item, at the consumer's option"); *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 255-56 (E.D. Pa. 2011) ($20 gift cards that were "freely transferable" and "can be used for literally thousands of products" were "more like 'cash' than 'coupons'"); *Perez v. Asurion Corp.*, No. 06-20734-CIV, 2007 WL 2591180, at *2 (S.D. Fla. Aug. 8, 2007) (finding settlement vouchers and calling cards "are not literally 'coupons' – in that they do not require the Class to purchase anything . . . "); *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2007 WL 4105971, at *5 (N.D. Cal. Nov. 16, 2007) ("[T]he in-kind relief offered in this case is not a 'coupon settlement' because it does not require class members to spend money in order to realize the settlement benefit."); *see also Kearney v. Hyundai Motor Am.*, No. SACV 09-1298-JST (MLGx), 2013 WL 3287996, at *7 n.5 (C.D. Cal. June 28, 2013) (stating that a "coupon settlement is one that 'provides benefits to class members in the form of a discount towards the future purchase of a product or service offered by the defendant'" (citation omitted)).

Like these cases and unlike *HP Inkjet*, the $20 Credit here is not a "coupon." The $20 Credit is fully transferrable and can be used at various Provide Commerce websites, which offer a large selection of items for sale under $20 (excluding service charges and taxes). (*See* ER 12, 17; SER 277.) The $20 Credit gives class

members the opportunity to purchase a product for *free*, as opposed to merely *discounting* products. Of course, the credits can also be applied as a discount toward more expensive items, at the option of the particular class member. (*Id.*) The $20 Credit provides a real benefit to the class. Unlike a "coupon," which offers a mere discount on more expensive items, the $20 Credit here is the equivalent of cash on Provide Commerce's websites when used.[8]

Additionally, the $20 Credit is not the only benefit provided to the class in the settlement. Rather, the $20 Credit was secondary to the primary benefit provided under the settlement—the opportunity to submit a claim for a cash payment of up to the full amount of monthly membership fees paid. The primary cash payment component is a second independent basis to distinguish this settlement from a "coupon" settlement within the meaning of CAFA.

The legislative history of CAFA demonstrates it was intended to apply only to "non-cash settlements." S. Rep. No. 109-14, at 31. Section 1712 expressly applies to "coupon settlements" and also contemplates "coupon settlements" in which equitable or injunctive relief is obtained. 28 U.S.C. § 1712 (a)-(c); *see HP Inkjet*, 716 F.3d at 1183 (CAFA contemplates two different scenarios: cases where

---

[8] Notably, several courts have approved class action settlements that offered cash equivalents and have found CAFA's requirements as to coupons do not apply. *See, e.g., Shames*, 2012 WL 5392159, at *16; *Reibstein*, 761 F. Supp. 2d at 255-56; *Browning*, 2007 WL 4105971, *5.

the class obtains only coupon relief (which are governed by § 1712(a)) and cases where a coupon settlement also provides for non-coupon relief such as equitable or injunctive relief (which are governed by § 1712(b))). The settlement here, however, which provides cash and credits without injunctive relief, does not fit into any of CAFA's scenarios. Indeed, *Section 1712 simply does not contemplate settlements like the one here*, where the settlement provides for a cash fund that is supplemented with a $20 Credit where class members may purchase products for free (excluding service charges and taxes). Objector completely ignores this fact.

Objector contends that *Synfuel v. DHL Express (USA)*, 463 F.3d 646, 654 (7th Cir. 2006) compels the holding that the $20 Credit is a "coupon[]" under CAFA, and that a contrary decision would create a circuit split. (OOB 23.) This contention is unavailing. The settlement disapproved in *Synfuel* is different from this one. In *Synfuel*, the Seventh Circuit reversed the district court's approval of a reversionary settlement in which claimants could opt between receiving up to four pre-paid shipping envelopes or $30 in cash. 463 F.3d at 648. Notably, the Seventh Circuit expressly recognized that the settlement was "not covered by the Class Action Fairness Act (CAFA) of 2005." *Id.* at 654. The court's main criticism regarding the approval of the settlement proffered in that case was that, "[i]n considering the fairness of the settlement, the [district] court did not attempt to

31.

quantify the value of plaintiffs' case or even the overall value of the settlement offer to class members." *Id.* Neither the facts nor the law applicable in *Synfuel* parallel the instant settlement, which involves a non-reversionary settlement providing cash to claimants and a $20 Credit to all class members, whether they submit a claim or not. Moreover, the district court here analyzed plaintiffs' claims and offered painstaking consideration of the overall value of the settlement to class members.

Because this is not a "coupon" settlement under CAFA, it is not necessary to subject it to CAFA's requirements relating to coupons in evaluating the attorneys' fee award.[9] 28 U.S.C. § 1712(e). As such, Objector's contention regarding the attorneys' fee award should be rejected.

### B.   Even If The Settlement Is Classified As A "Coupon" Settlement, The Judgment Should Be Affirmed.

Even if the $20 Credit is deemed to be a "coupon," and the overall settlement is analyzed as a "coupon" settlement under 28 U.S.C. § 1712, the settlement withstands scrutiny because the record supports the district court's

---

[9] Objector claims that CAFA calls for *heightened scrutiny* of a coupon settlement. (OOB 30, 34 n.7.) It is true that CAFA imposes one requirement on coupon settlements not generally applicable to class action settlements under Fed. R. Civ. P. 23(e)(2)—that, as a condition to approving the settlement, the district court make written findings that it is fair, reasonable, and adequate for class members. 28 U.S.C. § 1712(e). There is no dispute that the district court here met that requirement.

sound conclusion that the settlement was fair, reasonable, and adequate and that it was not the product of self-dealing.

### 1. Even if the $20 Credit is a coupon under CAFA, the settlement did not provide for a disproportionate fee award.

Objector contends that, due to the district court's conclusion that the $20 Credit was not a coupon, the district court improperly valued the settlement at $38 million, and then used that valuation to improperly reject Objector's argument that the attorneys' fee award is out of proportion to the total settlement value. (*See* OOB 27-35.) Objector's contention lacks merit. The district court determined the attorneys' fee award using two independent valuation methods: (1) percentage of the settlement value; and (2) lodestar. The attorneys' fee award was correct under either method. As such, even if the $20 Credit is a "coupon" under CAFA, the settlement did not provide for a disproportionate fee award, and the judgment should therefore be affirmed.

### a. The attorneys' fee award was proportionate under the percentage of total settlement value method.

Under the settlement, the $20 Credit will be issued to approximately 1.3 million class members. (ER 49.) At face value, the $20 Credit component is worth $26 million. The district court determined that the $20 Credit should be valued at the $20 face amount for various reasons: (1) the $20 Credit is provided in

addition to cash payments; (2) the $20 Credit was specifically tailored to address plaintiffs' allegations that they were induced into joining the Membership Programs with the promise of receiving a $15 gift code to be used on Provide Commerce's websites, which plaintiffs further alleged they did not actually receive; (3) the $20 Credit is fully transferrable; and (4) the $20 Credit may be used to purchase items without requiring class members to spend additional money for products.    (ER 17.)    Objector has not established that these factual determinations are clearly erroneous; indeed, they are sound factual findings and are each supported by the record.

Adding the $12.5 million cash fund component to the $26 million value of the $20 Credit component (valuing the $20 Credit at its full face value), the settlement's overall value equals $38.5 million.  Plaintiffs' $8.65 million attorneys' fee award constitutes 22.5%, which is well within the accepted 25% benchmark. *Hanlon*, 150 F.3d at 1029.

Before the district court, plaintiffs asserted that at most a 15% discount off the $20 face value should be used to determine the value of the $20 Credit component.  (SER 120-121 (citing *Fernandez v. Victoria Secret Stores, LLC,* No. 06-cv-04149 MMM (SHx), 2008 U.S. Dist. LEXIS 123546, at * 38-40 (C.D. Cal. July 21, 2008) (applying 15% discount to voucher component held not to be a

"coupon" under CAFA); *Young v. Polo Retail, LLC*, No. C-02-4546 VRW, 2007 U.S. Dist. LEXIS 27269, at *8, *22 (N.D. Cal. 2007) (same)).) Applying a 15% discount, the $20 Credit component would be valued at approximately $22.1 million, for an overall settlement value of approximately $34.6 million. The fee award of $8.65 million would constitute 25% of this amount, which is equal to *Hanlon*'s benchmark.

Although *Hanlon's* benchmark is 25%, this Circuit has approved fee awards as high as 33% of the total value in consumer class actions such as this one. *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (affirming attorneys' fee award of 33% of the recovery); *Morris v. Lifescan, Inc.*, 54 Fed. App'x 663, 664 (9th Cir. 2003) (affirming fee award of 33% of the recovery). Awarding plaintiffs' counsel here with 33% of the value of the settlement would justify the proposed $8.65 million award even if the credits were discounted to nearly 50% of their face value.

In short, the district court's attorneys' fee award should be affirmed because even if this Court finds that the $20 Credit component should have been be reduced to nearly 50% of the $20 face value, the attorneys' fee award is not disproportionate to the total value. Objector has cited no case law supporting a reduction of more than 50%, while the parties below and Provide Commerce here

have cited numerous cases supporting valuing the $20 Credit component at either face value or a reduction of less than 50%.

> **b.    The attorneys' fee award was proportionate under the lodestar valuation method.**

A second, independent basis for affirming the attorneys' fee award, regardless of whether the $20 Credit is held to be a "coupon," is that the attorneys' fee award was supported by the amount of time spent by plaintiffs' counsel in litigating the case. Section 1712(b) expressly permits a court to apply the lodestar method[10] to determine an appropriate attorneys' fee award where the settlement "provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not to be used to determine the attorney's fee to be paid to class counsel." 28 U.S.C. § 1712(b)(1). Here, the settlement contemplated a significant cash fund in addition to the purported "coupons." Consequently, CAFA permits the attorneys' fee award to be calculated using lodestar. *See HP Inkjet*,

---

[10] "The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011) (citation omitted). The lodestar figure is presumptively reasonable, and the court may adjust the figure up or down via application of a multiplier based on a number of factors, "including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Hanlon*, 150 F.3d at 1029 (citation omitted).

716 F.3d at 1184 ("[A] district court may award lodestar fees under subsection (b)(1) but only where the settlement is based 'in part' on coupon relief.").

Class counsel submitted detailed declarations documenting that they spent no less than 7,700 hours of work on the case. (SER 215-216 at ¶8; *see generally* SER 103-235.) Class counsel estimated the lodestar value at $4.3 million. (*Id.*) The district court found that class counsel's hours and expenses were reasonable in approving plaintiffs' $4.3 million estimate. (ER 29.) Moreover, the district court found that class counsel had obtained significant benefits for the class in the face of significant risk. (ER 29.) Accordingly, the district court found that a multiplier of 2.1 was reasonable and appropriate. (*Id.*) Objector has not challenged the district court's loadstar finding as clearly erroneous or as an abuse of discretion. As such, the fee award should not be disturbed.

### 2. The district court's findings support the conclusion that the settlement was not the product of self-dealing.

Objector suggests—without support—that the allegedly improper valuation of the settlement rendered the district court's conclusion that the settlement was not the product of self-dealing by plaintiffs' counsel. (OOB 24.) But the record amply supports the district court's findings that the settlement was free from self-dealing.

Initially, as set forth in the preceding section (Section III.B.1), the fee award was not disproportionate, and therefore Objector's "self-dealing" argument is based on a false premise.

Next, even if the fee award was disproportionate, it does not support Objector's contention of "self-dealing." Disproportionate fee awards are disconcerting because they *might* indicate "that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the [settlement] negotiations." *Bluetooth*, 654 F.3d at 947 (citation omitted). Yet a disparity between a settlement agreement's fee provision and the class award does not render the settlement *per se* unfair. *See id.* at 945 ("[W]e cannot say the disproportion between the fee award and the benefit obtained for the class was *per se* unreasonable").[11] Rather, where there is a disparity between the fee award and the benefit obtained for the class, a district court's approval is required "to be supported by a clear explanation of why the disproportionate fee is justified and does not betray the class's interests." *Id.* at 949; *see also id.* at 949-50 (stating that on remand the district court may, among other conclusions, find the "attorneys' fee award reasonable in light of the hours reasonably expended and the results

_____

[11] *See also In re Bluetooth Headset Prods. Liab. Litig.*, No. 07-ML-1822 DSF (Ex), 2012 WL 6869641, at *10 (C.D. Cal. Jul. 31, 2012) (re-approving settlement agreement on remand from *Bluetooth*, 654 F.3d 935, but awarding plaintiff's counsel less than the requested fees).

achieved, and re-approve both orders; it may determine the fee request is excessive but find no further evidence that class counsel betrayed class interests for their own benefit, and thus uphold the agreement while lowering the fee award"). Here, the district court's findings below meet and exceed this requirement, assuming *arguendo* that the attorneys' fee award was disproportionate.

The district court referenced ample evidence to support its conclusion that the settlement was fair and lacked collusion. Among other things, the district court found that: (1) "the relief offered by the $20 credits serves a specific purpose that is narrowly tailored to reflect the nature of Plaintiffs' allegations, specifically class members will receive a usable $20 credit of the type that was offered by the websites initially and subsequently caused them to be enrolled in the membership programs" (ER 17); (2) "there is a significant cash fund for class member claimants plus automatic $20 credits for every class member that add significant value to the overall settlement award" (ER 23); and (3) "[t]here were numerous settlement proceedings, several of which were presided over by well-respected retired district court judges and magistrate judges." (ER 24.)

These findings are supported by the record and support the conclusion that the "settlement is 'fair, adequate, and free from collusion.'" (ER 25 (citation omitted).) Consequently, *even if* the fee award is determined to be

disproportionate, the fairness overall is not in question, and the district court's approval of the settlement should be affirmed.

> **3.      Even if the attorneys' fee award is overturned, the overall settlement's approval should not be overturned, and any remand should be strictly limited to the amount of the attorneys' fee award.**

Objector states in the conclusion to his brief that this Court should "remand to determine the settlement [*sic*] fairness with an appropriately valued settlement." (OOB 52.)  To the extent he contends that the district court's determination that the overall settlement or class benefits (as opposed to just the attorneys' fee award) should be overturned, Objector's contention should be rejected.

First, Objector waived any argument that the overall settlement or class benefit terms are not fair, reasonable, and adequate; the only issues he preserved are related to the attorneys' fee award and the *cy pres* recipients (addressed below in Section III.D), not the overall settlement or class benefits.  Although Objector argues that the district court's valuation of the $20 Credit was improper, and therefore undermined the propriety of the attorneys' fee award, nowhere in his brief does he argue that the district court's valuation of the $20 Credit undermined the ultimate conclusion that the "proposed settlement is 'fair, adequate, and free from collusion.'"   (ER 25 (citation omitted).)   Indeed, below he expressly conceded that (i) other than the attorneys' fee award and *cy pres* recipients, the

settlement was fair, reasonable, and adequate, and (ii) he was not objecting to the

notice or class benefit terms.  Specifically, Objector stated:

> This is not an objection that the settling parties have colluded; this is not an objection that the total value of the settlement package is too small relative to the value of the litigation. It is an objection that the class counsel has seized a disproportionate share of the recovery in violation of Rule 23(e) and Ninth Circuit law; that the fee component does not comply with the Class Action Fairness Act ("CAFA"); and that *cy pres* is used impermissibly.

(ER 116.)  *See Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986)

(issues "not specifically and distinctly argued in appellant's opening brief" should

not be considered).  Further, Objector's "Statement of Issues" does not address the

impact of the valuation of the $20 Credit on whether approval of the settlement

was properly granted, as opposed to seeking reversal of the attorneys' fee award.

*See Belanger v. Madera Unified Sch. Dist.,* 963 F.2d 248, 250 n.1 (9th Cir. 1992)

(refusing to consider issue not raised in statement of issues presented for review,

nor discussed in opening brief).  Consequently, he has waived any challenge to the

overall fairness, and any remand should be strictly limited to the attorneys' fee

award if such award is overturned.

Second, Objector cannot avoid the consequences of his waiver by citing

*Bluetooth*'s statement that a "settlement must stand or fall in its entirety."

654 F.3d at 948 (citation and italics omitted).[12]  *Bluetooth* does not stand for the proposition that reversal of an attorneys' fee award mandates reversal of a settlement as a whole.  The statement in *Bluetooth* that a "settlement must stand or fall in its entirety" merely referenced that parties could not insulate a settlement from inquiries into "implicit collusion" by including a provision in the settlement that says the attorneys' fee provision is severable from the agreement.  *Id.* at 948.  Indeed, *Bluetooth* recognized that where "[a]pproval of the settlement agreement [is] not conditioned on the award of attorneys' fees . . . [a] vacatur of the fee award does not necessitate invalidation of the approval order."  *Id.* at 945; *see also Rodriguez*, 563 F.3d at 955 (reversing fee award but affirming settlement); *In re Prudential Sales Practice Litig.*, 148 F.3d 283, 346 (3d Cir. 1998) (same).

Further, any downward departure of the attorneys' fee award would not negatively impact the settlement overall or the class benefits.  Indeed, the opposite is true.  The parties expressly agreed under the settlement:

---

[12] A comparison between the arguments made by the settlement objectors on appeal in *Bluetooth* and *HP Inkjet* and Objector here confirm waiver.  In *HP Inkjet*, the settlement objector argued on appeal that "the settlement is the product of tacit collusion between class counsel and HP."  716 F.3d at 1175.  And in *Bluetooth*, the settlement objectors "challenge[d] the fairness and reasonableness of the settlement" and argued on appeal that "the district court abused its discretion in failing to consider whether the gross disproportion between the class award and the negotiated fee award was reasonable."  654 F.3d at 938.  No similar arguments were presented below or on appeal here.

> A reduction by the Court or by an appellate court of Class Counsel's attorneys' fees and costs award shall not affect any of the Parties' other rights and obligations under the Settlement Agreement, and shall only serve to increase the amount of the Net Cash Fund to be distributed as Settlement Payments to Authorized Claimants or any remainder, both of which are addressed below.

(ER 153.)  Accordingly, the district court's order granting final approval to the settlement and finding that it is fair, reasonable, and adequate and free from collusion stands, even though it may be charged with re-evaluating the attorneys' fee award on remand.  *See Reibstein,* 761 F. Supp. 2d at 256-57 (granting final approval after reducing enhancement award, and in doing so construing nearly identical language to mean that to the extent the court finds the enhancement award or attorneys' fee award to be problematic to approval for being disproportionate, the court may effectively cure the problem by reducing the fees as necessary without otherwise affecting the fairness of the overall settlement).

In short, a stray remark in the conclusion of an appellate brief asking for "remand to determine the settlement [*sic*] fairness with an appropriately valued settlement" is simply insufficient to support reversal of approval of the settlement, even if this Court reverses the district court's award of attorneys' fees.  This is particularly so under the settlement agreement here because, as structured, any

change in the attorneys' fee award shall only serve to increase the amount of the cash fund payable to class members or the *cy pres* recipients.

## C.     The District Court Appropriately Calculated The Settlement's Value.

Objector contends—as a fall-back argument—that even if the $20 Credit is not a "coupon" under CAFA, approval of the settlement must nevertheless be reversed because the district court's valuation of the $20 Credit as a "non-coupon" was also improper.  (OOB 29.)  Objector's fall-back argument should also be rejected.

First, as addressed above, the district court's valuation was not clearly erroneous.  Many courts use the face value of credits or vouchers for the purpose of assessing settlement value.  (*See infra* Section III.A.) Alternatively, several district courts have concluded that a 15% discount is properly applied to credits or vouchers containing usage limitations similar to those here.  (*See infra* Section III.B.1.)  As set forth above, applying a 0% to 50% discount to the face value of the $20 Credit component yields an attorneys' fee award between 22% to 33% of the total value, which is well within the range this Circuit has approved in other cases. (*Id.*)

Although Objector takes issue with the blackout dates and other usage limitations, he concedes in his brief that there was a justification for including the

usage limitations on the $20 Credits,[13] and other district courts have reduced the face value by 0% to 15% where the vouchers or credits had similar usage terms.

Second, Objector does not discuss why an improper valuation would undermine approval of the entire settlement. As set forth in Section III.B.3 above, the settlement valuation relates only to his objection to the attorneys' fee award, which is a limited issue that does not affect the entirety of the settlement.

Third, to the extent Objector contends certain of the $20 Credit's terms should be different, such a contention amounts to an impermissible complaint that the settlement could be "better." *See Hanlon*, 150 F.3d at 1027 ("Settlement is the offspring of compromise; the question [to] address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."); *O'Brien v. Brain Research Labs, LLC*, No. 12-204, 2012 WL 3242365, at *15 (D.N.J. Aug. 9, 2012) ("'[C]omplaining that a settlement should be 'better' is not a valid objection.'") (internal alterations and citation omitted). As such, it should be rejected.

---

[13] The $20 Credit cannot be used the week before Valentine's Day, Christmas, or Mother's Day because during these especially busy holiday periods, use of the credit could overwhelm fulfillment pressure at merchandise distribution centers. (ER 61-62.) These very limited "blackout dates" were the product of hard-fought negotiations between the parties, as supervised by a neutral mediator and retired federal magistrate judge (Judge Infante). (*Id.*)

Last, Objector's contention that the $20 Credit component should be valued at 1-3% of face value is specious.  (OOB 34.)  Initially, Objector's argument conflates the concepts of settlement valuation with redemption rates.  (OOB 29-34.)  Redemption rates are only relevant to an analysis of an attorneys' fee award in a "coupon" settlement under CAFA (28 U.S.C. § 1712(a).)  But this settlement is not a "coupon" settlement under CAFA, and even if it were, CAFA authorized the district court's use of the loadstar method instead of redemption rates as fully addressed in Section III.B.1 above.

Next, by Objector's own admission, a 1-3% valuation is only appropriate "in cases involving low value coupons" (OOB 33), *i.e.*, cases where coupons apply to only a tiny fraction of the total purchase price ($500 towards the purchase of a new car or $4 towards the cost of service on your car).  Indeed, the cases cited by Objector in support of his 1-3% redemption rate argument are plainly distinguishable because they involve small value coupons applicable only toward large purchases, and the coupons were issued only to class members who submitted a claim form, many of whom received only *publication notice* of the settlement benefits.  (OOB 33 n.6 (citing *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1060-61 (C.D. Cal. 2010) (providing $500 or $1000 rebates towards the purchase of another Honda vehicle); *Moody v. Sears Roebuck & Co.*,

664 S.E.2d 569, 572 (N.C. App. 2008) (providing $10 check or $4 coupon issued to class members only upon receipt of a valid claim, with no direct notice to class members—only publication notice); *Union Fidelity Life Ins. Co. v. McCurdy*, 781 So.2d 186, 188, 191 (Ala. 2000) (involving cash payments, not coupons or vouchers, but payments would be made to claimants only upon submission of a claim form *plus* documentation, and direct notice was issued to only 4% of class, with the rest receiving only publication notice)).)

In contrast, the $20 Credit here can be used to pay in full for a large selection of products priced at or below $20.  (ER 12, 17; SER 277.)  And it was provided after direct notice to all class members and was provided as a direct benefit, *i.e.* regardless of whether they submitted a claim form.  (ER 12, 13-14.)

## D. The *Cy Pres* Award Meets This Circuit's Standards For Approval.

The settlement provides that any unclaimed portion of the cash fund should be paid "on an equal basis to . . . University at San Diego (San Diego State University), University of California at San Diego, and University of San Diego School of Law" with the payments "to be used for a chair, professorship, fellowship, lectureship, seminar series or similar funding, gift, or donation program . . . regarding internet privacy or internet data security. . . ."  (ER 155.)

As this Court recently reaffirmed, *cy pres* distributions are appropriate where there is "a driving nexus between the plaintiff class and the *cy pres* beneficiaries." *Dennis*, 697 F.3d at 865 (citation omitted). "[S]ettling parties [need not] select a *cy pres* recipient that the court or class members would find ideal. On the contrary, such an intrusion into the private parties' negotiations would be improper and disruptive to the settlement process." *Lane*, 696 F.3d at 821; *accord Hanlon*, 150 F.3d at 1027.

Objector makes three objections to the settlement's *cy pres* recipients. First, he claims there is "an intolerable conflict of interest owing to a preexisting relationship with a *cy pres* beneficiary." (OOB 36.) Second, there is "an impermissible geographic discontinuity between the composition of the class (nationwide) and the locus of the *cy pres* recipients (San Diego)." (*Id.*) Third, he contends that the *cy pres* recipients are improper "when it is feasible to make further distributions to class members, at least when such distributions do not result in a legal windfall." (*Id.*) As explained below, each of Objector's objections lacks merit.

1.    **There is no impropriety because counsel does not have a "significant relationship" with the *cy pres* recipients and will not benefit from the distribution.**

Objector argues that the *cy pres* distribution is untenable because "lead plaintiffs' counsel James Patterson and defense counsel Michelle Doolin were graduates of *cy pres* beneficiary USD Law" and "[a] *cy pres* remedy should not be ordered if the court or any party has any *significant prior affiliation* with the intended recipient that would raise *substantial questions* about whether the award was made on the merits."  (OOB 37-38 (citing *ALI Principles* § 3:07 cmt. (b).)

The mere fact that a couple of attorneys ***out of the more than 20*** that appeared in or worked on this case are alumni of one of the three schools selected as *cy pres* recipients is not improper.  There is no assertion, much less evidence, that counsel for the parties have a "significant" connection or leadership role, ongoing or past, with the University of San Diego Law School.  Nor is there evidence counsel will somehow personally or professionally benefit from the distribution.  *Cf. In re Linerboard Antitrust Litig.*, MDL No. 1261, 2008 WL 4542669, at *5 (E.D. Pa. Oct. 3, 2008) (declining to award funds to two of three *cy pres* recipients where "an attorney formerly associated with this case currently serves in a lead role at" one of the recipients and one of class counsel's former partners founded the other proposed recipient).  Taken to the extreme, Objector's

49.

contention would automatically exclude any law school from being a *cy pres* recipient if the attorneys involved in the case were alumni of such institutions. Here, at least 12 law schools would be ineligible to be *cy pres* recipients based simply on attorney alumni status. Such an absurdity should be avoided.

Further, as the district court found, it is not particularly surprising that there is a tenuous alumni connection between a couple of the attorneys for the parties and one of the three proposed *cy pres* beneficiaries. (ER 19.) Provide Commerce is headquartered in San Diego. (ER 204.) This case was filed in San Diego, counsel and their law firms are located in San Diego, and naturally the University of San Diego Law School is located in San Diego. (ER 19.) The district court found—a finding that Objector does not challenge—that "[t]here is a rational connection between the chosen recipients and the nature of the settlement. Furthermore, simply by virtue of it being a law school, USD Law School may be in the best position to develop and research the legal issues associated with internet privacy and security underlying Plaintiffs' claims." (ER 20.)

Objector does not cite to a single case in which a court declared a *cy pres* distribution unenforceable where counsel's *alma mater* was a *cy pres* recipient. He points to news articles lamenting the fact that *judges*—not counsel—often have unfettered discretion to determine how best to distribute uncollected class action

settlement funds.    (OOB 38.)  But the district court did not select the *cy pres* recipients here.  The parties selected them as part of the arm's-length settlement negotiations.  Objector also cites to *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011), where this Circuit expressed concern that an appearance of impropriety may arise when "judges and outside entities deal[] in the distribution and solicitation of settlement money."  *Id.* at 1039.  That is not the case here as the parties' selected the *cy pres* recipients.

Instead of the parties selecting the *cy pres* recipients, Objector argues that a better practice would be to "poll class members . . . as to which charities should be designated *cy pres* beneficiaries."  (OOB 38 n.9.)  But, "settling parties [need not] select a *cy pres* recipient that the court or class members would find ideal."  *Lane*, 696 F.3d at 821; *accord Hanlon*, 150 F.3d at 1027.  This Circuit in *Lane* approved the parties' proposed *cy pres* distribution, despite the fact that an employee of the defendant sat on the board of the *cy pres* beneficiary, because the *cy pres* remedy was the offspring of compromise and would benefit absent class members and further the purposes of the privacy statutes that formed the basis for the lawsuit. 696 F.3d at 821-22.

Objector attempts to distinguish *Lane* on the basis that it did not involve an alleged conflict between class counsel and the recipient.  (OOB 39.)  But *Lane*'s

rationale that second-guessing the parties' choice of *cy pres* recipient would interfere with the private negotiated aspect of settlements and improperly disrupt the settlement process is equally applicable here. *Lane*, 696 F.3d at 821; *see also Hanlon*, 150 F.3d at 1027. Again, there is no evidence that counsel would receive any benefit as a result of the *cy pres* distribution.

> **2.    The *cy pres* recipients are proper because the funds will have benefits beyond San Diego.**

Objector next contends that the *cy pres* recipients allegedly "fail[] to account for the 'broad geographic distribution of the class.'" (OOB 40.) But this argument ignores the fact that "[i]t is not the location of the recipient which is key …." *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 36 (1st Cir. 2012). One of the issues presented to the First Circuit last year in *Lupron* was whether Dana Farber/Harvard Cancer Center was an appropriate *cy pres* recipient given it is located in "Boston while the injuries are to a national class." *Id.* In concluding it was an appropriate recipient, the First Circuit noted the *cy pres* fund "will have benefits well beyond Boston." *Id.*; *see also Perkins v. Am. Nat. Ins. Co.*, No. 05-CV-100 (CDL), 2012 WL 2839788, at *5 (M.D. Ga. July 10, 2012) (approving *cy pres* recipient whose "home is within the jurisdiction of this Court" since "it has the capability of awarding grants…on a national scale").

Here, like in *Lupron*, the proposed recipients will have an effect far beyond the greater San Diego metropolitan area. All three recipients' students and alumni have a nationwide presence. (ER 103-107; SER 53-67.) Education regarding internet privacy or internet data security will benefit the nationwide class because these three recipients will influence activities, action and enforcement relating to such issues—which were the issues in this case—by consumers, future plaintiffs and defense bar members, and future business leaders. Further, "[t]he Internet has no geographic boundaries." *Cyberspace, Comm'ns, Inc. v. Engler*, 55 F. Supp. 2d 737, 751 (E.D. Mich. 1999); *accord Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 851 (1997) ("'[C]yberspace'—[is] located in no particular geographical location but [is] available to anyone, anywhere in the world, with access to the Internet."). The education provided regarding internet privacy or data security will therefore have benefits nationwide and beyond.

Objector claims that *Nachshin* "requir[ed] geographic congruence between the class and the *cy pres* beneficiary." (OOB 40.) Not so. The Court in *Nachshin* declined to uphold the *cy pres* distribution because the proposed beneficiaries were ***both*** "geographically isolated" ***and*** "substantively unrelated" to the case. 663 F.3d at 1036. Similarly, the *cy pres* distribution in *In re Airline Ticket Comm'n*

*Antitrust Litig.*, 268 F.3d 619, 626 (7th Cir. 1980), cited by Objector (OOB 40-41), was also not tailored to the nature of the underlying lawsuit.[14]

Here, education regarding internet privacy or data security will have benefits to class members in and outside of San Diego because it is related to the subject matter of lawsuit, and because the recipients have the ability to reach a nationwide audience. *See Lane*, 696 F.3d at 821 (distribution of funds to *cy pres* recipients with a nexus to the lawsuit "will benefit absent class members"); *Nachshin*, 663 F.3d at 1036, 1041. Indeed, *Nachshin* suggested that, where all class members use the internet and their claims arise from a purportedly unlawful online advertising campaign, the parties could select "beneficiaries from any number of non-profit organizations that work to protect internet users from fraud, predation, and other forms of online malfeasance." *Id.* at 1041. That is because an internet presence focuses less on the physical locus, given that users can be anywhere. As such, San Diego-based universities can just as easily advance the interest of online actions of the type involved here as any other academic institution. The parties here selected

---

[14] The *cy pres* distribution in *Houck v. Folding Carton Admin. Comm.*, 881 F.2d 494, 502 (7th Cir. 1989), the other case relied on by Objector (OOB 40-41), was not invalidated because of any alleged geographic incongruence, but rather because it went against a specific direction of the district court that the funds not be distributed for a particular use. Indeed, the *Houck* court noted that the "two law schools, Loyola and the University of Chicago, are in no way disqualified from being the beneficiaries of some new appropriate *cy pres* use…" 881 F.2d at 502.

precisely such recipients. Consequently, Objector's geographic objection to the *cy pres* recipients fails. *See Perkins*, 2012 WL 2839788, at *4-5 (approving *cy pres* awards to the University of Georgia School of Law and the Mercer University School of Law, among other recipients).

### 3. The *cy pres* distribution should not be converted to a windfall to claimants at the expense of absent class members.

Last, Objector asks the court to adopt the American Law Institute (ALI)'s "last resort" rule and find that *cy pres* distribution is improper when there remain "feasible ways to distribute the fund's $3 million remainder to absent class members[.]" (OOB 42.) The ALI's bright-line "last resort" rule is *not* the law in this Circuit, nor should it be.

The Ninth Circuit has rejected bright-line rules like ALI's "last resort" rule in favor of a flexible approach under which a *cy pres* award is acceptable when it is "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members." *Nachshin*, 663 F.3d at 1039 (citing *Six Mexican Workers*, 904 F.2d at 1307). In compliance with these guidelines, the proposed *cy pres* distribution in this case represents a fair and reasonable effort to address the class's claims and to indirectly benefit the silent class members. *See Six Mexican*

*Workers*, 904 F.2d at 1305 (*cy pres* allows for "distribution of unclaimed funds to indirectly benefit the entire class").

As Objector acknowledges, the Third Circuit in *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) declined to hold that *cy pres* distributions are only appropriate where further individual distribution is economically infeasible. *Id.* at 173. That is because settlements are "private contracts reflecting negotiated compromises," and "[t]he role of a district court is not to determine whether the settlement is the fairest possible resolution" but is instead to determine "whether the compromises reflected in the settlement – including those terms relating to the allocation of settlement funds – are fair, reasonable, and adequate when considered from the perspective of the class as a whole." *Id.* at 173-74.

Objector's proposal would result in "overcompensating claimant class members [like Objector] at the expense of absent class members." *Lupron*, 677 F.3d at 35. Here, there is no *cy pres* distribution until after cash payments to class members who timely completed a valid claim form. (ER 154-155.) This claim process allows class members to claim a cash payment up to the full amount of monthly membership fees charged and not previously recouped. (*Id.*) Courts have repeatedly held that the ALI's preference that unclaimed funds be redistributed to class members is not applicable where class members have been fully compensated

for their losses. *See In re Universal Serv. Fund Telephone Billing Pracs. Litig.*, No. 02-MD-1468-JWL, 2013 WL 2476587, at \*2 (D. Kan. June 7, 2013) (noting that "each of the pertinent cases rejects the distribution of unclaimed funds to participating class members in favor of cy pres distribution when class members have already received full compensation for their injuries"); *Baby Prods.*, 708 F.3d at 176 (a *cy pres* distribution is appropriate "where all class members submitting claims have already been fully compensated for their damages by prior distributions" because "additional individual distributions would overcompensate claimant class members at the expense of absent class members" (internal alterations and citation omitted)); *Lupron*, 677 F.3d at 32 (explaining that ALI "was motivated by a concern that 'few settlements award 100 percent of a class member's losses, and thus it is unlikely in most cases that further distributions to class members would result in more than 100 percent recovery" (citation omitted)).[15]

---

[15] Similarly, in *Klier v. Elf Atomchem N.A., Inc.*, 658 F.3d 468 (5th Cir. 2011), a case relied on by Objector (OOB 43, 47-48), the Fifth Circuit explained that a district court should make additional pro rata distributions to class members "except where an additional distribution would provide a windfall to class members with liquidated-damages claims that were 100 percent satisfied by the initial distribution." 658 F.3d at 475. The court in *Klier* held that leftover settlement funds should have been distributed to class members who had been undercompensated, instead of to third-party charities, where the *cy pres* distribution was imposed on the parties by the trial court. *Id.* at 475-78. That is

Objector's other *cy pres*-related arguments should similarly be rejected. He contends that the settlement is "lopsided" and that the court should accordingly be "skeptical" of the agreement. (OOB 43-45.) Again, Objector completely ignores the benefit to the class of the $20 Credit. *Every single class member*, including those who did not submit claim forms, will receive a benefit in the form of a $20 Credit off future purchases from certain Provide Commerce websites. Considering both cash and credit benefits, the district court valued the settlement fund at $38 million. (ER 28-29.) The approximate *cy pres* amount of $3 million is therefore in actuality only around 8% of the total settlement value. It is by no means lopsided.

Objector also contends that the district court "overlook[ed] the possibility of employing methods that would compensate those absent class members who had not yet submitted any claim (*e.g.*, supplement notice and outreach, sampling for lottery payout, or perhaps a direct distribution of some kind)." (OOB 46.) However, "'complaining that a settlement should be 'better' is not a valid objection.'" *O'Brien*, 2012 WL 3242365 at *15 (internal alterations and citation omitted); *see also Hanlon*, 150 F.3d at 1027.

---

not the case here. Further, the parties' settlement agreement in *Klier* did "not even purport to provide full, individualized compensation" but rather "authorized pro rata distributions that were dictated by a formula…" *Id.* at 479-80. Here, by contrast, the claims process allowed for a cash payment for the full amount of monthly fees paid (less any prior payment for such fees).

Additionally, there is nothing surprising about a low claims rate. A study of securities fraud class actions found that even highly sophisticated institutional investors often fail to claim settlement benefits. James D. Cox & Randall S. Thomas, *Letting Billions Slip Through Your Fingers: Empirical Evidence and Legal Implications of the Failure of Financial Institutions to Participate in Securities Class Action Settlements*, 58 Stan. L. Rev. 411, 412 (2005). Commentators have noted that is not unusual for the claims rate in consumer cases, where recoveries tend to be small, to reach only into the single digits. *See* Samuel Issacharoff & Geoffrey P. Miller, *Will Aggregate Litigation Come to Europe?*, 62 Vand. L. Rev. 179, 205 (2009). There is no reason to believe that supplemental notice and outreach would result in a significant number of additional claims. Moreover, one could also infer from the low claims rate that those class members who were dissatisfied with their enrollment in the membership programs had already requested and obtained full payment for membership fees, that class members were satisfied with their enrollment, or that class members chose not to make a claim because of brand loyalty or based on philosophical differences with the litigation. (*See* discussion at ER 59-60.)

Objector also contends that the FAC's prayer for statutory damages, special and exemplary or punitive damages, interest, and restitution support his assertion

that claimant class members should receive further compensation.  (OOB 47.)  But this Circuit rejected a similar argument in *Lane* where the objectors contended that the district court was required to provide specific commentary on each of the plaintiffs' claims and to find a specific monetary value corresponding to such claims.  696 F.3d at 822-23.  This Circuit found that the district court need not reach specific findings of fact as to the potential recovery for each cause of action because such a requirement would be "onerous," "impossible," as well as "speculative and contingent."  *Id*. at 823.  This Circuit further noted that the district court "acted properly in evaluating the strength of the plaintiffs' *case* in its entirety rather than on a claim-by-claim basis."  *Id*.

The First Circuit's decision in *Lupron* also rejected a similar argument: "Because the consumer fund was established for the benefit of all consumer purchasers of Lupron, not just the 11,000 who filed claims, the court appropriately determined that the 'next best' relief would be a *cy pres* distribution which would benefit the potentially large number of absent class members."  677 F.3d at 34; *see also California v. Levi Strauss & Co*., 41 Cal. 3d 460, 476 (1986) ("[C]laimant fund sharing provides no benefits to silent class members.  Further, if there is a windfall, it goes not to further the purposes of the substantive law. . . .").  Additionally, permitting further payments to claimant class members "could create

a perverse incentive among victims to bring suits where large numbers of absent class members were unlikely to make claims. It might also create an incentive for the represented class members to keep information from the absent class members." *Lupron*, 677 F.3d at 35 (citations omitted).

In sum, c*y pres* is a well-accepted method in this Circuit for distributing unclaimed settlement funds and CAFA explicitly approves such awards. 28 U.S.C. § 1712(e). The *cy pres* in this case meets the standards for final approval in this Circuit, and should therefore be upheld.

## CONCLUSION

Because the settlement is fair, reasonable, and adequate, the Court should affirm the judgment. Even if the Court determines that the attorneys' fee award should be reversed, the district court's determination that the settlement as a whole should be approved should remain undisturbed. Any remand should be limited to the amount of the attorneys' fee award, and not any other aspect of the settlement.

Dated: September 11, 2013          COOLEY LLP


                                  By:   /s/Michael G. Rhodes
                                        Michael G. Rhodes

                                  Attorneys for Appellee
                                  PROVIDE COMMERCE, INC.

## CERTIFICATE OF COMPLIANCE PURSUANT TO FRAP 32(A)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE NUMBER 13-55373

I certify that, pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening brief is proportionately spaced, has a typeface of 14 points or more, and contains 13,824 words.

Dated:  September 11, 2013          COOLEY LLP


By:   /s/Michael G. Rhodes
          Michael G. Rhodes

Attorneys for Appellee
PROVIDE COMMERCE, INC.

## STATEMENT OF RELATED CASES PURSUANT TO
## NINTH CIRCUIT RULE 28-2.6

Appellee Provide Commerce, Inc. states that it does not know of any related cases pending in this court.


Dated:  September 11, 2013          COOLEY LLP


                                    By:   /s/Michael G. Rhodes
                                          Michael G. Rhodes

                                    Attorneys for Appellee
                                    PROVIDE COMMERCE, INC.

63

| 9th Circuit Case Number(s) | 13-55373 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) _____ .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) 9/11/2013 .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

| | | |
|---|---|---|
| Ethan T. Boyer | Elliott L. Pell | Mazin A. Sbaiti |
| Michael L. Kirby | Jay J. Rice | Baron & Budd PC |
| Kirby Noonan Lance & Hoge LLP | Nagel Rice LLP | 3102 Oak Lawn Ave |
| 350 Tenth Avenue, Suite 1300 | 103 Eisenhower Pky, Ste. 103 | Suite 1100 |
| San Diego, CA 92101 | Roseland, NJ 07068 | Dallas, TX  75219 |

Signature (use "s/" format)    /s/Michael G. Rhodes